In re DISASTER AT DETROIT
METROPOLITAN AIRPORT
ON AUGUST 16, 1987.

No. 742.

United States District Court,
E.D. Michigan, S.D.

Sept. 29, 1989.

Charles Brewer, Phoenix, Ariz., Stanley Chesley, Cincinnati, Ohio, Lee Kreindler, New York City, Gerald Lear, Thomas Meehan, Washington, D.C., Richard Schaden, Birmingham, Mich., for plaintiff's Steering Committee.

Carroll E. Dubuc, Washington, D.C., for defendant Northwest Airlines.

John J. Hennelly, Los Angeles, Cal., Donald E. Shely, Detroit, Mich., for defendant McDonnell Douglas.

ORDER

JULIAN ABELE COOK, Jr., Chief Judge.

This Order is designed to resolve the plethora of pleadings that have raised choice of law issues in this multidistrict litigation.[1] In a case of this magnitude, in which one hundred fifty-seven claims have been filed in four federal judicial districts against two defendants that are incorporated in different states, the choice of law questions are numerous. Yet, all of them must be resolved as expeditiously as possible. The prospect of deciding choice of law questions in a multidistrict context prompted Judge Pierson M. Hall to state:

> The law on "choice of law" in the various states and in the federal courts is a veritable jungle, which, if the law can be found out, leads not to a "rule of action" but a reign of chaos dominated in each case by the judge's "informed guess" as to what some other state other than the one in which he sits would hold its law to be.

*In re Paris Air Crash of March 3, 1974,* 399 F.Supp. 732, 739 (C.D.Cal.1975).

In the case *sub judice,* the legal quagmire known as choice of law has once again reared its ugly head in the multidistrict context and currently requires the immediate attention and resources of this Court. For the following reasons, this Court concludes that (1) the law of California shall apply to all Plaintiffs' product liability claims against McDonnell Douglas Corporation (MDC), (2) the law of Michigan shall apply to all Plaintiffs' punitive and exemplary damage claims except those cases that were filed in California against MDC, in which case, the law of California shall apply, and (3) the parties must rebrief the choice of law issues concerning the Plaintiffs' claims for compensatory damages on a date which shall be established by this Court.[2]

I

On August 16, 1987, Northwest Airlines Flight 255, a DC–9 aircraft which was designed and manufactured by MDC, crashed shortly after takeoff from Detroit Metropolitan Airport and resulted in the death of one hundred fifty-six persons. Cecelia Cichan, four years of age, was the sole surviving passenger of the crash.

Less than two weeks later (August 28, 1987), the first case was filed in the Eastern District of Michigan. On December 9, 1987, the Judicial Panel on Multidistrict Litigation ordered the transfer of all Flight 255 federal cases to this district for consolidated pretrial proceedings.

On August 18, 1989, this Court issued an Order in which it (1) transferred and consolidated all cases relating to the Flight 255 matter, *see* 28 U.S.C. § 1404(a); *Fed.R.*

---

1. This Order addresses the merits of the following motions: (1) PSC Motion for a Determination That Damages Law Of Transferor Court Will Govern Transferred Cases (April 3, 1989); (2) PSC Memorandum Of Law Seeking The Application Of Michigan Law To The Conduct Of Northwest And California Law To The Conduct Of MDC (June 15, 1989); (3) Northwest's Motion To Dismiss All Claims Against It For Puni-

tive Or Exemplary Damages (July 17, 1989); (4) MDC Motion To Dismiss Or For Partial Summary Judgment (Punitive And Exemplary Damages) (July 17, 1989).

2. This Order does not attempt to resolve all choice of law issues that have been presented in this multidistrict litigation.

Civ.P. 42(a), (2) bifurcated the issue of liability from the issue of damages, *see Fed. R. Civ.P.* 42(b), and (3) scheduled the commencement of a joint liability trial, which was designed to resolve all liability issues, for October 2, 1989. *See In re Air Crash Disaster at Detroit Metropolitan Airport on August 16, 1987,* 737 F.Supp. 391 (E.D. Mich.1989).

As of the date of this Order, one hundred fifty seven cases have been filed in this matter on behalf of the passengers and flight attendants on the accident aircraft who died or were injured in the crash, and those persons who were killed or injured as a result of being present at the accident site at the time of the crash. These cases were originally filed in Michigan, Arizona, California, and Florida.[3] The Defendants, Northwest Airlines, Inc. (Northwest) and McDonnell Douglas Corporation (MDC), have also filed cross claims and third party claims against each other.[4]

Generally, the Plaintiffs have filed wrongful death claims in which they seek compensatory, as well as punitive, damages from MDC and Northwest.[5] The Plaintiffs' allegations of wrongdoing by Northwest focuses on (1) the preflight and take-off conduct of the flight crew, (2) the maintenance of the accident aircraft, and (3) the training of the flight crew. With regard to the alleged misconduct of MDC, the Plaintiffs' claims center on (1) the design, testing, and manufacture of the accident aircraft, and (2) the failure to warn of known deficiencies of certain components and instruments on the accident aircraft.

The parties in this case maintain that choice of law issues exist in the following contested matters: (1) MDC's potential liability for the alleged design defects, (2) Northwest's and MDC's potential liability for punitive or exemplary damages, and (3) Plaintiffs' individual claims for compensatory damages. These are the issues that will now be resolved by this Court.[6]

## II

At the onset of any case in which legally significant facts have occurred in more than one state, the Court must identify those states that have sufficient contacts with this litigation. Once these states have been identified, this Court must determine whether the various substantive laws at issue differ with regard to the particular issues in contest. Should the substance of the relevant state laws differ or conflict, then it will become necessary to apply the choice of law rules of the forum states. *See e.g., In re Air Crash Disaster Near Chicago, Illinois,* 644 F.2d 594, 605 (7th Cir.), *cert. denied,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 187 (1981).

This may result in the application of "the rules of different states to determine different issues in the same case."[7] Reese, *Depecage: A Common Phenomenon in Choice of Law,* 73 Colum.L.Rev. 58, 75 (1973). The parties in the instant cause have, in large part, ignored this principle by arguing that the law of a particular state should govern all issues which relate to a particular defendant. In most states that have abandoned the *lex loci delicti* rule, the resolution of the choice of law

---

**3.** Some Plaintiffs have filed identical complaints in the Eastern District of Michigan and in a transferor court.

**4.** Northwest also filed third party claims against Texas Instruments, Inc., National Car Rental Systems, Inc. and the United States of America. On February 21, 1989, this Court severed these third party claims from the instant dispute between the Plaintiffs, Northwest, and MDC.

**5.** Although all of the Plaintiffs have not (1) sued MDC, (2) alleged identical theories of recovery, or (3) lodged the same prayer for relief, their claims are sufficiently similar to be generally characterized as wrongful death actions.

**6.** When the substantive laws of the various states are not in conflict on a particular issue, judicial efficiency counsels that the law of the forum may be applied. *In re Air Crash Disaster at Washington, D.C.,* 559 F.Supp. 333, 342–43 (D.D.C.1983); *see also* S. SPEISER & C. KRAUSE, AVIATION TORT LAW § 2.1 at 63 & n. 11 (1978).

**7.** Such a process in the context of a conflict of law analysis is commonly referred to as *depecage.*

analysis will depend upon the issue in question. The search in these cases is not to determine which state law will be applied to all of the issues in a case, but to identify the rule of law that will be applied to each particular issue in which a conflict is presented.

It is well settled that a federal court, which sits in diversity matters, must apply the choice of law rules of the forum state. *Klaxton Co. v. Senator Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1942); *Erie R. R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). It has also been established that when a case is transferred pursuant to 28 U.S.C. § 1404, the transferee court must apply the choice of law rules of the transferor forum.[8] *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); *In re Benedectin Litigation*, 857 F.2d 290, 306 (6th Cir.1988), *cert. denied*, 488 U.S. 1006, 109 S.Ct. 788, 102 L.Ed.2d 779 (1989); *Martin v. Stokes*, 623 F.2d 469, 471–74 (6th Cir.1980). On the basis of the record in the case *sub judice*, the relevant choice of law rules at issue are those of Michigan, Arizona, California, and Florida.

All of these states have abandoned the *lex loci delicti* doctrine as a methodology for resolving choice of law questions. Instead, these jurisdictions have adopted an approach which focuses on, in varying ways, the interest that each state has in having its substantive law apply in a particular case.

Michigan, which has refused to adopt an established choice of law methodology, essentially considers whether there exists a "rational reason" to displace the law of the forum in favor of the law of another state. *See Olmstead v. Anderson*, 428 Mich. 1, 400 N.W.2d 292 (1987). Both Arizona and Florida have adopted the approach of the Restatement (Second) of Conflict of Laws (Restatement). *See Bishop v. Florida Specialty Paint Co.*, 389 So.2d 999 (Fla.1980); *Schwartz v. Schwartz*, 103 Ariz. 562, 447 P.2d 254 (1968). California has incorporated the so-called "comparative impairment" approach. *See Bernhard v. Harrah's Club*, 16 Cal.3d 313, 128 Cal.Rptr. 215, 546 P.2d 719 (1976). The following is a concise discussion of the choice of law principles in these four states.

### A

In *Sexton v. Ryder Truck Rental*, 413 Mich. 406, 320 N.W.2d 843 (1982), the Michigan Supreme Court abandoned *lex loci delicti* as an absolute rule, but declined to adopt a particular choice of law rule. However, in *Olmstead v. Anderson*, 428 Mich. 1, 29–30, 400 N.W.2d 292, 304–05 (1987), the Michigan high court determined that, when presented with conflicting laws, the courts must consider whether there exists a "rational reason to displace Michigan law in th[e] case," which focused upon (1) the particular interest that each state has in having its substantive law apply to the precise issue in question, and (2) whether applying *lex loci delicti* will advance the interests of certainty, predictability of results, and prevention of forum shopping.[9]

---

**8.** While Northwest concedes "the precedential value of *Martin v. Stokes*, it reserves the right to argue on appeal that the *Van Dusen* principle does not apply in cases where plaintiffs have sought the transfer," citing *In re Korean Air Lines Disaster*, 829 F.2d 1171, 1173 n. 4 (D.C.Cir.1987). The Sixth Circuit Court of Appeals, however, recently addressed this issue and concluded that *Van Dusen* applies regardless of which party sought a § 1404 transfer. *In re Bendectin Litigation*, 857 F.2d 290, 306 (6th Cir.1988).

**9.** MDC contends that the Michigan legislature has expressly resolved all choice of law issues in the Plaintiffs' claims which sound in tort and occur on an airplane while in Michigan airspace. In support of its position, MDC cites M.C.L.A. § 259.177, which provides:

All crimes, torts and other wrongs committed by or against an airman or passenger while in flight over this state shall be governed by the laws of this state; and the question whether damages occasioned by or to an aircraft while in flight over this state constitutes a tort crime or other wrong by or against the owner of such aircraft, shall be determined by the laws of this state.

M.C.L.A. § 259.177 (West 1977).

This Court disagrees governing the forum selection issue in this litigation. When the forerunner to this statute was enacted in 1923, *see* Mich.Pub.Acts, 1923, No. 224, § 7, the *lex loci delicti* rule was firmly entrenched in Michigan law. In those cases involving air crashes on Michigan soil, the Michigan courts applied its own substantive law under the *lex loci* doctrine.

## B

■ In the context of an alleged tort involving a foreign element, the Arizona and Florida courts apply the principles of the Restatement (Second) of Conflicts of Laws (Restatement) in order to identify the substantive law that is to be applied to the issue presented. *See Bates v. Superior Court of Arizona,* 156 Ariz. 46, 749 P.2d 1367 (1988); *Schwartz v. Schwartz,* 103 Ariz. 562, 447 P.2d 254 (1968); *Bishop v. Florida Specialty Paint Co.,* 389 So.2d 999 (Fla.1980).

With regard to wrongful death claims, the Restatement (Second) essentially reflects a presumption that the laws of the state where the injury occurred should govern "unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 175 (1971).[10] Restatement § 6(2) outlines the various "relevant factors" that should be considered in a choice of law analysis:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of the justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 6(2) (1971).

The particular contacts that are to be taken into account in applying the factors in § 6(2) are (1) the place of the injury, (2) the place of misconduct, (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and (4) the place where the relationship between the parties is centered. RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 145(2).

The Arizona Supreme Court, in *Bates,* 156 Ariz. at 50, 749 P.2d at 1370, stated "[t]he inquiry is qualitative, not quantitative. *Ambrose v. Illinois–California Express, Inc.,* 151 Ariz. 527, 530, 729 P.2d 331, 334 (App.1986). The Court must evaluate the contacts 'according to their relative importance with respect to the particular issue.' Restatement § 145(a)."

## C

■ California employs a "comparative impairment" approach to choice of law questions. *Offshore Rental Co., Inc. v. Continental Oil Co.,* 22 Cal.3d 157, 148 Cal.Rptr. 867, 583 P.2d 721 (1978); *Bernhard v. Harrah's Club,* 16 Cal.3d 313, 128 Cal.Rptr. 215, 546 P.2d 719 (1976). Under this approach, the Court must first determine whether the substantive laws of the involved states differ on the point in issue. If an apparent conflict exists between the laws of the interested states, the Court should then ascertain whether a "moderate and restrained interpretation" of the poli-

---

This being the case, it would have been redundant for the Michigan legislature to codify the "site of the injury" rule when such a standard was firmly established in the common law doctrine of the state.

The literal language of this statute clearly indicates that it was designed to resolve choice of law issues in those cases in which a tort, such as an assault or battery, occurred on board an aircraft while traveling in Michigan airspace. In such a case, it would be difficult to determine where the "site of the injury" occurred under the traditional *lex loci* approach.

Interestingly, this Court has not found, and the parties have been unable to cite, any case authority in which a Michigan court has applied

§ 259.177 to resolve choice of law issues in cases containing a foreign element which results from an aircraft accident. It would be improvident to adopt MDC's construction of § 259.177 given (1) the historical context in which it was enacted, and (2) the dearth of Michigan case authority to support such a proposition.

10. With regard to damages, the Restatement (Second) provides that "[t]he law selected by application of the rule of § 175 determines the measure of damages in an action for wrongful death." RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 178 (1971).

cies suggests that only one state has a legitimate interest in the application of its law. *Bernhard,* 16 Cal.3d at 320, 128 Cal. Rptr. at 219, 546 P.2d at 723.

Should a more moderate and restrained interpretation fail to resolve the conflict, then the court is presented with a "true conflict." Under this comparative impairment approach, the "true conflict should be resolved by applying the law of the state whose interest would be the more impaired if its law were not applied." *Id.* at 320, 128 Cal.Rptr. at 219, 546 P.2d at 723. The process of weighing conflicting state interests does not depend on a determination of which law "manifest[s] the 'better' or the 'worthier' social policy on the specific issue." *Offshore Rental,* 22 Cal.3d at 165, 148 Cal.Rptr. at 872, 583 P.2d at 726.

In assessing the relative interests of the involved states, the Courts should consider (1) whether a particular statute is "archaic" and "isolated" from the more "prevalent and progressive" laws, (2) the "fit" between the purpose of the law and the factual context presented in the instant action, and (3) whether the policy that is reflected in the law at issue can be satisfied by some means other than its application to the case at bar. *Offshore Rental,* 22 Cal.3d at 165–

66, 148 Cal.Rptr. at 872–73, 583 P.2d at 726–27.

### III

This Court will now examine the choice of law questions that have been presented in the several design defect claims.

### A

■ With regard to those claims that were filed against MDC by Michigan claimants, the states having contacts are Michigan (the place of the injury and where the Michigan Plaintiffs filed), Missouri (its principal place of business),[11] and California (the place of MDC's alleged misconduct).[12] Having identified the relevant states, this Court must now determine whether the relevant states have conflicting laws pertaining to design defects. If so, Michigan's choice of law rule must be applied in order to resolve such a conflict.

The Michigan Supreme Court has refused to adopt the doctrine of strict liability in tort for product defects. *See Prentis v. Yale Manufacturing Co.,* 421 Mich. 670, 682 n. 9, 687 n. 24, 365 N.W.2d 176, 181 n. 9, 184 n. 24 (1984). In *Prentis,* the Michigan Supreme Court stated that "the proper test for determining a manufacturer's liability for defective design is negligence."

---

**11.** Another contact, which is typically considered in most choice of law methodologies, is the place where the relationship between the parties is centered. While there is some disagreement among the parties on this point, this Court concludes that the relationship in the case at bar is centered on the aircraft itself. *See Pittway Corp. v. Lockheed Aircraft Corp.,* 641 F.2d 524, 527 n. 2 (7th Cir.1981); *Wert v. McDonnell Douglas Corp.,* 634 F.Supp. 401, 404 n. 3 (E.D.Mo.1986).

**12.** MDC argues that the alleged misconduct did not occur in California where the aircraft was manufactured and designed, in part, because the components at issue (the P–40 circuit breaker, the Central Aural Warning System, and the Flight Director) were individually designed and manufactured in Massachusetts, Missouri, and Arizona, respectively. MDC's Brief Concerning Choice of Law on Liability and Punitive Damages at 10 (July 17, 1989).

However, to pare the Plaintiffs' design defect claims into subcategories and thereby conduct a separate choice of law analysis for each component, which has been alleged to be defective,

would complicate and obfuscate the complex choice of law issues in this case and would require the jury to apply various and, possibly different, product liability standards in the same case dependent upon the particular component at issue. MDC also recognizes the problems that are associated with conducting a separate choice of law analysis for each component part:

Although the Court could conceivably apply different laws [ ... ] to different claims against MDC (e.g. Massachusetts law to claims based on the circuit breaker, Arizona law to claims based on the Flight Director, and Missouri law to the claims based on the central aural warning computer), this would hopelessly confuse and complicate the case. The jury instructions would be multitudinous, inconsistent, and incomprehensible to the jury.

MDC's Brief Concerning Choice of Law on Liability and Punitive Damages Issues at 13–14 (July 17, 1989).

Therefore, given that MDC manufactured and partially designed the accident aircraft in California, it believes that situs best represents the "place of the alleged misconduct" for purposes of the design defect claims.

*Id.* at 687 n. 25, 365 N.W.2d at 184 n. 25. In those cases in which liability against a manufacturer is predicated upon defective design, the Michigan courts follow a pure negligence risk-utility test. In essence, this test focuses on whether the manufacturer exercised reasonable care in making its design choices in light of the alternatives and risks that were presented under the circumstances. *Id.* at 688–691, 365 N.W.2d at 184.

In contrast to Michigan, the Missouri Supreme Court has adopted the rule of strict liability in tort as set forth in the Restatement (Second) of Torts § 402A (Restatement). *See Klein v. General Electric Co.,* 714 S.W.2d 896 (Mo.App.1986); *Blevins v. Cushman Motors,* 551 S.W.2d 602, 607 (Mo.1977) (en banc); *Keener v. Dayton Electric Manufacturing Co.,* 445 S.W.2d 362 (Mo.1969) (en banc). Under the Restatement approach, a manufacturer is strictly liable for selling any product in a "defective condition unreasonably dangerous." Under Missouri's model of strict liability, "the primary inquiry in a design defect case is whether the product—because of the way it is designed—creates an unreasonable risk of danger to the consumer or user when put to normal use." *Nesselrode v. Executive Beechcraft, Inc.,* 707 S.W.2d 371, 375 (Mo.1986) (en banc).[13]

The California Supreme Court has refused to follow the "unreasonably dangerous" requirement of the Restatement § 402, and, instead, allows a plaintiff to recover in a strict products liability litigation upon establishing that the product was merely "defective." In *Barker v. Lull Engineering Co.,* 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978), the California Supreme Court developed a two-pronged test under which a plaintiff may establish that a design was defective. Under this approach, a product is defectively designed if the plaintiff proves that (1) a product is not safe as an ordinary consumer might expect when used in an intended or reasonably foreseeable manner, or (2) the product's design was the proximate cause of the injury and the defendant fails to prove that the benefits of the product as designed outweigh the inherent risks in such a design. *Id.* at 418, 143 Cal.Rptr. at 228, 573 P.2d at 446.[14]

As is evident from this discussion, the substance of the product liability laws of the three involved states are in conflict. Therefore, this Court must apply choice of law rule in the State of Michigan in order to determine which products liability law a Michigan court would apply in this case.

The Michigan choice of law doctrine centers on whether there is rational reason to

**13.** Some states, which purport to adopt the § 402A strict liability standard, utilize a consumer expectation test in evaluating design hazards. This approach derives from Comment (i) of § 402A, which essentially states that a product is unreasonably dangerous if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer or user who possesses common knowledge as to the products characteristics. Other courts attempt to define "unreasonably dangerous" by employing a risk-utility test. On a general level, this approach focuses on whether the magnitude of the danger outweighs the utility of the product at issue. *See, e.g. Turner v. General Motors Corp.,* 584 S.W.2d 844, 850–51 (Tex.1979).

However, in *Nesselrode,* the Missouri Supreme Court noted that it had neither incorporated the consumer expectation test nor the risk-utility test into the lexicon of its products liability law. *Nesselrode,* 707 S.W.2d at 377–78. Instead, the Missouri high court stated that "[u]nder our model of strict tort liability the concept of unreasonable danger, which is determinative of whether a product is defective in a design case,

is presented to the jury as an ultimate issue without further definition." *Id.* at 378 (footnote omitted).

**14.** In rejecting the Restatement test, the California Supreme Court recognized the following:

This is not to say that the expectations of the ordinary consumer are irrelevant to the determination of whether a product is defective, for ... we believe that ordinary consumer expectations are frequently of direct significance to the defectiveness issue. The flaw in the Restatement analysis, in our view, is that it treats such consumer expectations as a "ceiling" on a manufacturer's responsibility under strict liability principles, rather than as a "floor." As we shall explain, past California decisions establish that *at a minimum* a product must meet ordinary consumer expectations as to safety to avoid being found defective.

*Barker,* 20 Cal.3d at 425 n. 7, 143 Cal.Rptr. at 233 n. 7, 573 P.2d at 451 n. 7 (emphasis in original).

displace its own law in favor of the law of a foreign state. In order to answer this question, it is necessary to identify (1) the policies that are reflected in each state's products liability law, and (2) the interest, if any, of each state in applying its own law in order to implement the policies that have been incorporated into its product law.

As was intimated in *Reyno v. Piper Aircraft Co.*, 630 F.2d 149, 167 (3d Cir.1980), the standards of strict liability and negligence essentially further the same policies of regulation and compensation. They differ only when there is an attempt to balance those policies. The *Reyno* Court stated:

> The choice between holding a manufacturer liable only for negligence and holding it strictly liable for any dangerous products or design is, practically speaking, a matter both of searching for optimal deterrence of harmful conduct and of allocating the costs of injuries either to producers or consumers. A negligence standard is, broadly speaking, more protective of producers, while strict liability is more solicitous of consumers.

*Id.*

Michigan's negligence risk-utility products liability law reflects a producer protective policy. Such a doctrine is designed to induce companies to conduct business in Michigan by protecting domiciled producers from excessive financial liability. By protecting the economic health of companies that conduct business in Michigan, the state derives substantial revenues in sales and taxes, directly and indirectly, and furthers the economic well being of the entire state.

In contrast, the strict product liability laws of California and Missouri reflect a consumer protective and a producer regulatory policy.[15] First, these laws are intended to encourage the design of safe products, thereby reducing the incidence of injuries by making the producer incur the monetary consequences that are associated with defective goods. In addition, strict liability reflects a determination that the costs of damaging events, which result from defective products, can best be born by the entities that produce and sell the products. *See Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d at 362, 364 (Mo.1969) (en banc). Second, strict products liability laws reflect a concern that the injured party receive adequate compensation and not become a ward of the state.

With respect to the Plaintiffs' design defect claims against MDC, there is a rational reason to displace the Michigan products liability law. In the factual situation, which has been presented in the case at bar, Michigan does not have a strong interest in the application of its producer protective products law. An application of the law of Michigan in this case would not induce MDC, or other similarly situated companies, to conduct business in Michigan or stimulate the economy. MDC is only affiliated with Michigan because Northwest, one of its purchasers, does business in that state. It is not only unlikely, but implausible, that an airplane manufacturer would be induced to contract with an airline company, which does business in Michigan, based on that state's favorable product liability laws. Invariably, each state would have some tort or contract law that would be favorable to MDC's interest and some that would be detrimental to its interest. Obviously, MDC would not decide whether to contract with a particular airline company on this basis. Michigan simply has no interest in applying its law to protect a foreign state producer that supplies products for a company doing business in that state.[16]

15. Although there are doctrial variations between the strict products liability laws of California and Missouri, these laws reflect the same basic policy considerations for the purposes of choice of law consideration.

16. Michigan has no interest in applying its law to the detriment of those who initiated legal action in its courts. Michigan's products liability law, which reflects a policy favoring producers, is not conversely designed to punish its plaintiff-consumers. Michigan's negligence risk-utility doctrine is, for choice of law purposes, consumer neutral. It is also doctrinally incomplete for the parties to contend that, since the accident occurred at the airport in Detroit, the State of Michigan has a strong interest in applying its products liability law in order to

In contrast, however, both California and Missouri have a strong interest in applying its products liability law in this case. Their strict liability laws reflect a desire to (1) regulate culpable conduct occurring within its borders, (2) induce corporations to design safe products and deter future misconduct, and (3) impose the financial repercussions, which have been incurred by the user of a defective product, upon the producer. Therefore, Missouri, MDC's principal place of business, and California, the place of manufacture and design of the accident aircraft, have a significant interest in applying its design defect standards in order to effectuate the regulatory policy which is reflected in their laws.[17]

Because Missouri and California have a strong interest in having its products liability law apply to the conduct of MDC, there exists a rational reason to displace Michigan law in this case. Although the elements and the evidentiary standards of the strict products liability laws of Missouri and California vary, the interests of these two states would not be compromised by the application of the law of the other state. In choosing between these two states, this Court believes that California has a greater interest in applying its own law since the alleged wrongful conduct by MDC occurred within its borders. While Missouri has a general concern for controlling the activities of its corporations, California has an interest in controlling any specific conduct (decisions by MDC regarding the design of the aircraft) that primarily takes place within that state. For the foregoing reasons, this Court concludes that the Michigan claimants must establish their contention of design defects against

MDC pursuant to the products liability law of California.

**B**

With regard to the claims that were filed in Arizona, the states with contacts to the instant litigation include Michigan (place of injury), California (place of the alleged misconduct), and Missouri (MDC's principal place of business). However, unlike the analysis under Michigan's choice of law rules, a fourth state, Arizona (domicile or residence of many Plaintiffs) also has a connection with this litigation which must be taken into account. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2) (1971).

The products liability laws of Michigan, California, and Missouri were outlined above and were deemed to be in conflict, thereby necessitating the application of the forum's choice of law rules. However, before applying Arizona's choice of law rules in this context, it is necessary to determine its product liability standards and how it relates to the standards of the three other states in which legally significant events occurred.

In *O.S. Stapley Co. v. Miller*, 103 Ariz. 556, 447 P.2d 248 (1968) (en banc), the Arizona Supreme Court adopted the strict liability standard in § 402A of the Restatement. Unlike its California neighbor, Arizona has not eliminated the element of "unreasonably dangerous condition" as a strict liability requirement. However, the Arizona Supreme Court has stated that California's products law is nothing more than a "logical refinement" of Arizona's products doctrine. *Dart v. Wiebe Manufacturing, Inc.*, 147 Ariz. 242, 245, 709 P.2d

prevent similar disasters from occurring within its borders and to promote air safety. On a general level, all states, including Michigan, would endorse these safety concerns. However, under the Michigan choice of law rules, this Court must identify those policies within the particular substantive law at issue and, on the basis of these policies, determine whether Michigan has an interest in having its law apply to a particular fact pattern. In the case at bar, the application of its products liability law, which reflects a producer protective policy, would not further either of these safety concerns.

17. This Court acknowledges that a second policy, which assures the citizens of Missouri and California that they will be adequately compensated for their injuries, would not be advanced by the application of the law of either state to Michigan claimants. However, this does not detract from both states' interest in applying its law to further the strong regulatory policy within those laws.

876, 879 (1985) (en banc).[18] The *Dart* Court stated that the question of defective and unreasonably dangerous condition, which represent the basic elements of its strict product liability law, should be resolved primarily on the basis of the consumer expectation test. However, in those cases in which "that test is inapplicable because the ordinary consumer would not form an expectation with regard to the relevant safety feature," the plaintiff may pursue a strict liability risk-benefit analysis as outlined in *Dorsey v. Yoder Co.*, 331 F.Supp. 753 (E.D.Pa.1971), *aff'd*, 474 F.2d 1339 (3d Cir.1973). *Dart*, 147 Ariz. at 248, 709 P.2d at 882 (construing *Byrns v. Riddell*, 113 Ariz. 264, 550 P.2d 1065 (1976)).

In summary, the products liability laws of the states with relevant contacts to the instant litigation under the Arizona choice of law rules are as follows: Michigan follows the negligence risk-utility test, Missouri follows the Restatement's strict liability test, and California and Arizona follow a two pronged strict liability test. As was the case with the claims which were filed in Michigan, there exists a significant distinction in the substantive products liability laws that must be resolved by the choice of law rules of Arizona.

Accordingly to Arizona's choice of law methodology, the products liability of Michigan, the place where the injury occurred, should apply "unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6." RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 175 (1971). However, one of the "relevant factors" of substantial import on this issue, a concern for the "relevant poli-

cies of other interested states and the relative interests of those states in the determination of the particular issue," *id.* § 6(2), counsels that the law of California should apply.

California has a very strong interest in the application of its producer regulatory products liability law to those companies that are located within its borders. In contrast, Michigan has only a slight interest in the application of its producer protective laws to a nondomiciliary corporation. Arizona has a strong interest in applying its strict products liability laws in favor of its own residents in order to further the consumer protective policy which is reflected in its laws. However, Arizona's interest would not be compromised by the application of California law because (1) the products liability laws of these two states are nearly identical and (2) the law of California would equally further the consumer protective policy which is reflected in Arizona's law.

The application of the law of California to a corporation which conducts significant business in that state, would not upset the "justified expectations" of MDC. Certainly, MDC could not maintain that it did not expect that its conduct in designing the accident aircraft would not be subject to the product liability standards of California. In addition and for the purposes of trial, the presentation of one standard of liability for allegedly defective products—in this instance, California—to the jury would (1) simplify the matter for the jurors and (2) result in consistent findings on this issue regardless of where the claim was filed. Such a uniform result would also discourage and minimize forum shopping.[19]

---

**18.** The Court in *Dart* noted that it declined to eliminate the "unreasonably dangerous" requirement in the Restatement only because "we believe that retaining the formulation helps avoid the risk that jurors will decide that any product which causes an injury is 'defective' and thus averts the conversion of products liability law into absolute liability. Despite the cirumlocation, we suspect that the 'unreasonably dangers' test may have a very pragmatic meaning for jurors." *Dart*, 147 Ariz. at 244 n. 1, 709 P.2d at 878 n. 1. The California Supreme Court disagrees with *Dart* on this point. *See Barker*,

20 Cal.3d at 426 n. 8, 143 Cal.Rptr. at 234 n. 8, 573 P.2d at 452 n. 8.

**19.** The other relevant factors that are listed in the Restatement include (1) the needs of the interstate system, (2) the basic policies underlying the particular field of law, and (3) the ease in the determination and application of the law to be applied.

The first two factors are not particularly instructive in this case because (1) the application of a negligence or strict liability standard will not affect the manner in which the interstate

Therefore, for the foregoing reasons, this Court concludes that an Arizona court would apply the products liability law of California to the design defect contentions of the Arizona claimants.

## C

With regard to those parties who filed their claims which sound in products liability in Florida, the courts in that state have adopted the strict liability standard of the Restatement. *West v. Caterpiller Tractor Co.*, 336 So.2d 80, 87 (Fla.1976). Because Florida, like Arizona, has incorporated the "most significant relationship" test of the Restatement as its choice of law methodology and its products law similarly reflects consumer protective and producer regulatory policies, the conflicts analyses by these states with regard to this issue are the same. Therefore, based on the rationale, which was discussed with regard to the Arizona claims, this Court determines that the law of California shall also apply to those claims that were filed in Florida on this issue and sound in products liability.

## D

■ With regard to the claimants who initiated their lawsuits in California, the states having relevant contacts are Michigan (the place of the injury), Missouri (principal place of business), and California (place of the alleged wrongdoing and the domicile or residence of some California claimants). As has been previously discussed at length, a conflict exists between the products liability laws of these three involved states which render it necessary to employ California's "comparative impairment" choice of law doctrine.

The adoption of a "moderate and restrained interpretation" of the policies in the product liability standards of Michigan, California, and Missouri, as required under a "comparative impairment" approach, will reveal that only California has a legitimate interest in the application of its strict liability law in the case *sub judice*. Simply stated, because the application of Michigan's producer protective products law would not advance the protection of the domiciliary producers from excessive liability, Michigan has a slight interest in having its laws apply in favor of MDC in this case. In contrast, California has a paramount interest in the application of its producer regulating and consumer protective policies in a case in which the plaintiffs are residents or domicilaries of that state and the defendant conducts significant business within its borders. Moreover, the application of California law would not contravene the producer regulatory policy which is reflected in Missouri's products liability law.

Inasmuch as Michigan has no legitimate interest in the application of its law in this case, and no true conflict exists between the laws of California and Missouri,[20] this Court believes that, under the "comparative impairment" doctrine, California would apply its own law on the issue of whether MDC had defectively designed the component parts in question.

## IV

### A

■ With regard to the punitive damages claims against Northwest, the states having legally significant contacts are Michigan (place of injury) and Minnesota (place of alleged misconduct and principal

---

system works, and (2) while the basic policies underlying products liability statutes seem to favor the consumer protective and producer regulatory policies that are reflected in strict liability laws, these policies are not universal and conflict with the producer protective policies of some states.

**20.** Even if a true conflict existed between the laws of California and Missouri, the interests of the State of California would be more impaired if its law was not applied to this issue. This is because there is a more solid "fit" between the

purpose of California's law and its application to the resident plaintiffs and defendants of that state. An application of California law in this context will advance a desire (1) to compensate its own residents and (2) to deter any future designing misdeeds of a putative tortfeasor. In contrast, the application of the law of Missouri would only further that state's regulatory interest, but would not further its compensatory purpose since the California litigants are not Missouri residents.

place of business). However, unlike the choice of law analysis that was employed by this Court regarding the issue of products liability, the domicile or residence of the plaintiff is not relevant to an evaluation of the choice of law issues concerning punitive damages because the decision by a state on whether to allow punitive damages focuses solely on corporate regulatory versus corporate protective policies.

The policy, which is reflected in those laws that prohibit an award of punitive damages, is the protection of domicilary defendants from excessive financial liability. Those states which have refused to impose punitive damages on its defendants have done so in order to promote (1) the financial stability of the businesses that conduct their affairs within its borders, and (2) the overall economic well-being of its citizenry.

Similarly, those states that permit the imposition of punitive damages do so in order to further the regulatory and deterrent policies within their laws. Certainly, all states have a strong interest in assuring that its claimants are adequately compensated for their injuries. However, this interest is satiated by an award of compensatory damages. Once its plaintiffs are made whole by the recovery of compensatory damages, the interest of the plaintiff's state of domicile is satisfied. *See In re Air Crash Disaster Near Chicago, Ill.*, 644 F.2d 594, 612–13 (7th Cir.), *cert. denied,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 187 (1981); *Dobelle v. National R.R. Passenger Corp.*, 628 F.Supp. 1518 (S.D.N.Y. 1986); *Keene Corp. v. Insurance Company of North America,* 597 F.Supp. 934 D.D.C.1984). Therefore, this Court will review the punitive damages laws of the relevant states to determine if a conflict exists.

### B

■ In Michigan, the courts of that State refuse to allow the recovery of punitive damages. *See Kewin v. Massachu-*

*setts Mutual Life Ins. Co.,* 409 Mich. 401, 295 N.W.2d 50 (1980); *Currie v. Fiting,* 375 Mich. 440, 134 N.W.2d 611 (1965); *Hicks v. Ottewell,* 174 Mich.App. 750, 436 N.W.2d 453 (1989); *Kirk v. Ford Motor Co.,* 147 Mich.App. 337, 383 N.W.2d 193 (1985); *Association Research & Development Corp. v. CNA Financial Corp.,* 123 Mich.App. 162, 333 N.W.2d 206, *leave to appeal den.,* 418 Mich. 858 (1983). While exemplary damages are distinct from punitive damages and are designed to compensate plaintiffs for humiliation, outrage, and indignity resulting from a defendant's wilful, wanton, or malicious conduct, *see CNA Financial,* 123 Mich.App. at 171, 333 N.W.2d at 211, neither form of damages is available under the Michigan Wrongful Death Act, M.C.L.A. § 600.2922 (West 1986). This Act has been construed by the Michigan Supreme Court as the statute which provides the exclusive remedies for those injuries which result in death, *see Endykiewicz v. State Highway Commission,* 414 Mich. 377, 387–88, 324 N.W.2d 755 (1982); *Courtney v. Apple,* 345 Mich. 223, 228, 76 N.W.2d 80, 83 (1956), and that statute does not provide for punitive or exemplary damages. *See Bernier v. Board of County Road Commissioners,* 581 F.Supp. 71, 80 (W.D.Mich.1983); *cf. Currie,* 375 Mich. 440, 134 N.W.2d 611.

The Plaintiffs' Steering Committee (PSC) in the case at bar concedes that punitive and exemplary damages are not available under Michigan's Wrongful Death Act. However, the PSC contends that a recent decision by the Michigan Supreme Court in *Hardy v. Maxheimer,* 429 Mich. 422, 416 N.W.2d 299 (1987), indicates that exemplary damages may be permissible in a wrongful death action under Michigan's Survival Act, M.C.L.A. § 600.2921 (West 1986).

For the following reasons, this Court declines to adopt the PSC's position on the issue of the availability of punitive or exemplary damages in wrongful death cases under Michigan law.[21]

---

**21.** The PSC also maintains that a choice of law determination on the issue of punitive damages is premature at this stage of the litigation. In support of this contention, the PSC states that

"[t]he punitive damage issue ... involves more complex choice of law issues and may be affected by which cases remain unsettled (and, consequently which choice of law rules apply) when

In *Hardy*, the Michigan Supreme Court addressed whether the term "action which survives by law" within a statute of limitations savings provision applies only in those cases in which death was noninstantaneous (a survival action at common law), and not in cases in which death was instantaneous (a wrongful death action at common law). In its response, the Court concluded that the right to recover damages for a wrongful death "survives by law," regardless of whether death was instantaneous or noninstantaneous because a cause of action under the Wrongful Death Act accrues at the time that the injury was inflicted, not upon death. Thus, it was determined that the savings provision at issue tolled the statute of limitations in those actions which had been brought pursuant to the Wrongful Death Act without regard to whether the death of the decedent was, or was not, instantaneous.

In support of its decision, the *Hardy* Court noted that the Wrongful Death Act was enacted in 1939 in order to consolidate the common law survival and the wrongful death actions into a single cause of action in all cases in which injuries result in death. *Id.* at 433, 416 N.W.2d at 303–04. In the opinion of the Court, "the Legislature's intention in creating one unified cause of action for wrongful death under [M.C.L.A. § 600.2922] was to end the predicament created by the need to distinguish between instantaneous and noninstantaneous death." *Id.* M.C.L.A. § 600.2921, the Survival Statute under which the PSC desires to obtain punitive damages, clearly states that all injuries resulting in death must be pursued pursuant to the terms of the Wrongful Death Act, M.C.L.A. § 600.2922.

The *Hardy* rationale indicates that regardless of whether a decedent dies noninstantaneously or instantaneously, or whether his claims "survive by law," the Wrongful Death Act is the sole cause of

action and remedy that is available to redress those injuries which result in death. Therefore, because punitive damages are not available under the Michigan Wrongful Death Act, this Court concludes that the Plaintiffs may not pursue such damages under Michigan law.

In contrast to Michigan, it is conceded that the Minnesota Wrongful Death Act was amended in 1983 to provide for awards of punitive damages. Minn.Stat. § 573.02(1) (1984). Having identified a conflict between the laws of Michigan and Minnesota regarding punitive damages, this Court must determine whether a rational reason exists to displace Michigan's law on this issue. The first step under Michigan's choice of law rules is to determine the purpose reflected in the relative law of each involved state.

The law of Michigan, which denies the application of punitive damages in wrongful death cases, reflects the same corporate protection policy in those states that refuse to impose strict products liability in tort. By insulating those companies, which conduct extensive business within its borders, the nonpunitive damages states hope to promote corporate migration into its economy. The protection of the financial stability of domiciliary corporations is designed to enhance the economic climate and well being of the state by generating revenues. *See Chicago*, 644 F.2d at 614.

The law of Minnesota, which permits the imposition of damages that are punitive in nature, is designed to punish its corporate defendants and deter future misconduct. *See Chicago*, 644 F.2d at 613. Therefore, Minnesota's law reflects a corporate regulatory policy.

Having identified the policies within the substantive laws at issue, this Court must next examine, as mandated by Michigan's jurisdiction selection provision, the precise

the liability trial commences." PSC Memorandum of Law Seeking Application of Michigan Law to the Conduct of Northwest and California Law to the Conduct of MDC at 21 (June 15, 1989).
This Court disagrees. Inasmuch as a joint trial on all liability issues in this case is scheduled to

commence on October 2, 1989, a choice of law determination at this time cannot be considered premature. The settlement of some of the cases subsequent to the issuance of this Order will not affect the choice of law analysis by this Court on the issue of punitive damages.

interest that each state has in applying its damages law in the case *sub judice.*

Michigan has a very strong interest in the application of its law which prohibits the imposition of punitive damages on companies doing substantial business within its borders. In fact, an application of Michigan's anti-punitive damages law to Northwest, a corporation which maintains a major "hub" within the metropolitan Detroit area and conducts a substantial amount of business in that state, would further the precise interest in its law. If Michigan did not apply its corporate protective law in this context, foreign corporations, as well as Northwest, might refuse to locate and conduct any business in the state. However, by applying its law to protect the financial integrity of corporations which generate substantial revenues for its citizens, Michigan may indeed induce other businesses to enter the state with the assurance that, although responsible for its own torts, a company shall be immune from excessive financial liability. For these various reasons, Michigan has a very strong interest in the application of its anti-punitive damages law to the question of Northwest's financial liability in the case at bar.[22]

The State of Minnesota, Northwest's principal place of business, also has an obvious interest in deterring and preventing any wrongful conduct by those corporations which locate their corporate headquarters within its borders. The application of Minnesota's law in this case would further the regulatory policy within its punitive damages law. *See Chicago,* 644 F.2d at 615; *Emmart v. Piper Aircraft Corp.,* 659 F.Supp. 843, 845–46 (S.D.Fla.1987); *In re Air Crash at Stapelton International Airport, Denver, Colorado, on November 15, 1987,* 720 F.Supp. 1445 (D.Col.1988).

Allowing the Plaintiffs in this case to recover punitive damages against Northwest under Minnesota law would undermine Michigan's law, which is designed to protect those Defendants, who conduct substantial business within its borders, from excessive liability. By contrast, an application of Michigan's law that precludes plaintiffs from requesting punitive damages in wrongful death cases, would significantly undermine Minnesota's regulatory policy regarding the deterrence of tortious conduct. Therefore, inasmuch as Michigan and Minnesota have a strong interest in the application of their respective laws, the application of the law of one state will undermine the policy which is reflected in the law of the other state.

In applying Michigan's choice of law rules, this Court concludes that there is no rational reason to abandon Michigan law. Since the Michigan Supreme Court issued its seminal decision in *Sexton v. Ryder Truck Rental, Inc.,* 413 Mich. 406, 320 N.W.2d 843 (1982), the application of its choice of law rules to the "true conflict" has not been adjudicated by the courts of that state. This Court concludes, however, that in those cases in which Michigan has a strong interest in applying its laws in order to implement its own policies, the Michigan courts would not displace its own laws in

---

**22.** This Court rejects any suggestion that it was merely fortuitous that the Northwest aircraft crashed in Michigan, thereby minimizing the interest of the place of the accident. The accident in question does not present the typical "fly over" case in which a plane crashes while passing through its airspace. In the classic "fly over" case, the crash site is fortuitous since there is an equal likelihood that the crash could have occurred in one of any number of states over which the plane was scheduled to travel. *See Pittway Corp. v. Lockheed Aircraft Corp.,* 641 F.2d 524, 528 (7th Cir.1981); *Halstead v. United States,* 535 F.Supp. 782 (D.Conn.1982); *Melton v. Borg–Warner Corp.,* 467 F.Supp. 983 (W.D. Tex.1979); *Bruce v. Martin–Marietta Corp.,* 418 F.Supp. 829 (W.D.Okl.1975), *aff'd,* 544 F.2d 442 (10th Cir.1976).

However, in this case, Northwest chose Michigan to serve as a regional "hub" through which it would conduct substantial flight operations. Certainly, a crash at the "hub" of an airline company, the destination and point of departure of substantial air traffic, is not fortuitous, in that it is foreseeable that an accident might occur there. It is also significant that the alleged wrongdoing by Northwest and MDC focuses, in large part, on the takeoff procedures and portion of the flight, which was centered at Detroit Metropolitan Airport. *See In re Air Crash at Washington, D.C.,* 559 F.Supp. 333, 350 (D.D.C.1983).

favor of the law from a foreign state.[23]

While this Court concedes that Minnesota has a very strong interest in applying its law to further the regulatory policy which is evident within its punitive damages law, this interest is not so overwhelming that it should displace the application of Michigan law in this case. Therefore, with regard to the issue of Northwest's potential liability for punitive damages, Michigan substantive law shall apply.[24]

■ Turning next to MDC, the states with legally significant contacts for jurisdiction selection purposes are Michigan (place of injury), California (place of misconduct), and Missouri (principal place of business).

Michigan prohibits the imposition of punitive damages in wrongful death actions. Similarly, with regard to the laws of California, it is well established and uncontested that punitive damages may not be recovered in a wrongful death action. *See Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976); *Ford Motor Co. v. Superior Court of Alameda County*, 120 Cal. App.3d 748, 175 Cal.Rptr. 39 (Cal.Dist.Ct. App.1981).

It is further uncontested that the Missouri Wrongful Death Act, like Michigan's Wrongful Death Act, does not allow for punitive damages. Mo.Stat.Ann. § 537.080 *et seq.* (Vernon 1988). However, it remains a point of contention as to whether damages for "aggravating circumstances" are available in death cases. The Seventh Circuit Court of Appeals addressed this issue in *In re Air Crash Disaster Near Chicago, Illinois*, 644 F.2d 594, 607 (7th Cir.), *cert. denied*, 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 187 (1981) and concluded that "the damages allowed under Missouri law with regard to 'aggravating circumstances' can be considered within the meaning of 'punitive' damages as sought by the plaintiffs."

MDC maintains that the Seventh Circuit Court of Appeals' erred in treating damages for "aggravating circumstances" as the equivalent of punitive damages in wrongful death cases. In support of its position, MDC cites *Glick v. Ballentine Produce, Inc.*, 396 S.W.2d 609, 616–17 (Mo. 1965), in which the Missouri Supreme Court stated:

> While added damages because of "aggravating circumstances" may, in a sense, be punitive in nature, they are not to be submitted as such nor are they to be submitted separately, nor in any total

**23.** The late Brainerd Currie, creator of the "governmental interest analysis" as a choice of law methodology, would agree with the conclusion that Michigan law should apply in this case:

> The sensible and clearly constitutional thing for any court to do, confronted with a true conflict of interests, is to apply its own law. In this way it can be sure at least that it is consistently advancing the policy of its own state. It should apply its own law ... simply because a court should never apply any other law except when there is good reason for doing so. That so doing will promote the interests of a foreign state at the expense of the interests of the forum state is not a good reason.

> B. CURRIE, SELECTED ESSAYS ON THE CONFLICT OF LAWS 119 (1963).

**24.** This holding is not inconsistent with the *Chicago* opinion. In *Chicago*, the court intimated that the interests of the place of the alleged misconduct or the principal place of business, taken separately, would have a greater interest than the state where the accident occurred. If presented with the same facts as in the *Chicago* case, this Court would conclude that the interest

of Michigan, the place of the injury, should yield to the interest of Minnesota, Northwest's principal place of business.

> However, the fact that Detroit Metropolitan Airport is a regional "hub" for Northwest, which results in the influx of significant revenues that stimulates and stabilizes the local economy, alters the balance of interests and, thus, distinguishes *Chicago* from the instant case. This Court concedes that most airlines will not be dissuaded from doing business in a major city, such as Chicago, merely because the State of Illinois does not apply its anti-punitive damages law in favor of the business community. However, with regard to choosing the location of a regional "hub," Michigan's refusal to apply its favorable law may have altered Northwest's decision making process. In addition, the failure to apply Michigan law in an effort to protect Northwest from an excessive liability award is not likely to induce additional corporate migration into the state. In sum, the factual distinctions between this case and the *Chicago* case warrant the different results on this issue and, therefore, the choice of law analyses should not be construed as conflicting.

verdict and judgment to exceed the statutory limit. Within that total limit the jury may exercise a broad discretion.

In *Chicago,* a case in which MDC was a litigant, the Seventh Circuit Court of Appeals addressed (1) the *Glick* case, and (2) the merits of MDC's interpretation of that case. The *Chicago* Court noted that MDC's argument was based on a "selective quotation" and ignored critical language within the *Glick* decision which indicated that while "there [is] no recovery under Missouri law for punitive damages, 'as such,' ... 'aggravating circumstances' [can] be considered by the jury so long as the total verdict [does] not exceed the statutory limit." *Chicago,* 644 F.2d at 607. Moreover, the *Chicago* court believed that MDC's position on this issue was contrary to well established Missouri case law:

> Damages for "aggravating circumstances" have been permitted by Missouri wrongful death statutes since 1855, and have consistently been considered punitive or exemplary by the Missouri Supreme Court.

*Id.* at 606 (citations omitted). For the foregoing reasons, the Court of Appeals for the Seventh Circuit concluded that "aggravating circumstances" damages, the "equivalent" of punitive damages, were available in wrongful death actions under Missouri law.

The Missouri Court of Appeals decision in *Blum v. Airport Terminal Services, Inc.,* 762 S.W.2d 67 (Mo.App.1988), which reflects the most recently published Missouri case to examine the correlation between punitive and aggravating circumstances damages, supports the decision of the Seventh Circuit Court of Appeals in *Chicago.* The *Blum* court stated:

> Aggravating circumstances damages are punitive in nature. *Williams v. Excavating & Foundation Co.,* 230 Mo.App.

973, 93 S.W.2d 123 (1936). It is their purpose to punish the defendant and deter future wrongdoing. *Morrissey v. Welsh Co.,* 821 F.2d 1294 (8th Cir.1987). They are in that respect akin to punitive damages. Accordingly, an award for more than compensatory damages in a wrongful death case is permissible only if the decedent would have been entitled to punitive damages had he lived. *Dougherty v. Smith,* 480 S.W.2d 519 (Mo.App.1972).

Contrary to the contentions of MDC, it appears that the Missouri courts construe damages for aggravating circumstances as the "equivalent" of punitive damages in wrongful death cases. Therefore, this Court agrees with the analysis and conclusion in *Chicago* and concludes that, subject to the protective caveats in *Glick,* the Missouri courts would allow a jury to consider aggravating circumstances that would justify an award of damages, which are punitive in nature, in excess of any compensatory damages award in a wrongful death case.

In summary, the laws of Michigan and California do not provide for the imposition of punitive damages while Missouri law would permit the recovery of damages that are punitive in nature. As in *Chicago,* this case presents a "true conflict" in which the law of the principal place of business conflicts with the law of the place of misconduct. The application of California law, which is designed to protect corporate defendants from excessive liability, would frustrate the regulatory policy within the law of Missouri. Conversely, the application of Missouri's law would impair the corporation protective policy of the law of California.[25]

When confronted with this same situation, the Seventh Circuit Court of Appeals in the *Chicago* case noted that there was

---

25. Missouri's interest in applying its punitive damages law is greater that its interest in applying its products liability law. With regard to products liability issues, Missouri's interest is subordinate to California's interest because the alleged malfeasance at issue occurred in large part within the state of California. However, the analysis relating to punitive damages differs

because the decisions and actions of MDC are not limited to conduct that occurred exclusively in California but may include corporate decisions, if any, that were made in Missouri. Thus, it is impossible to make a reasoned decision as to which state law should apply solely on the respective interests of California and Missouri.

no principled basis upon which to decide which state has a greater interest than the other.[26] In this situation, the *Chicago* court determined that under the Restatement methodology, the law of the place injury should apply to the conduct of MDC:

> [A]pplication of [the law of the place of injury] comports with the general criteria of the Restatement (Second) which emphasize certainty, predictability, uniformity of result, and ease in the determination and application of the law to be applied. In this case, it is important to resolve the conflict between states by a principled means. Determining that all other facts being equal, that law of the place of injury shall be used, provides a principled means of decision which also creates certainty.

> Future defendants cannot predict, of course, where airplane disasters will occur. But air transportation companies will now be on notice that, under the "most significant relationship" test, when there is a true conflict between the laws of state having equal interests in the issue of punitive damages, and when the place of injury has a strong interest in air safety and in protection of air transportation corporations, the law of the place of injury will apply. Our result also comports with the Restatement (Second)'s principle that choice of law rules should be relatively simply and easy to apply.

*Chicago*, 644 F.2d at 616 (citations & footnote omitted).

This Court adopts and incorporates the reasoning and rationale of the Seventh Circuit Court of Appeals in *Chicago*, in that it similarly believes that the application of the law of the place of injury is a principled and reasonable way in which to resolve the conflict in this case. An application of the law of the State of Michigan, the site of the accident, will further the interests of certainty, predictability of result and the prevention of forum shopping, which together constitutes the second-prong of Michigan's choice of law analysis. In fact, the *Chicago* court warned MDC, and other similarly situated corporations, that they should expect the law of the place of injury to apply when confronted with the law of states with equal interests in the issue of punitive damages. Clearly, MDC, who was a defendant in the *Chicago* litigation, cannot maintain that it could not have anticipated that the law of the place of the injury would apply in this context.

For these reasons, this Court will employ the rule which was fashioned in *Chicago* and apply the punitive damages law of Michigan, the place of the injury, in order to resolve the true conflict in which two involved states have an equal interest in applying its punitive damages law. The fact that the *Chicago* analysis pertained to the Restatement Second, which differs from Michigan's choice of law rules, does not alter this result.[27]

26. For the reasons that have been stated in the section relating to products liability, this Court similarly believes that Michigan has a remote interest in applying its corporation protective law to MDC since its application would not further the corporate migration policy in that law. *See supra* note 16 and accompanying text. *See also infra* note 27. In this context, in which the forum is relatively disinterested and a true conflict exists between the laws of two foreign states, Brainerd Currie acknowledged the unresolvable doctrinal flaw with the interest analysis methodology to choice of law issues:

> When the forum state is disinterested, and there is a genuine conflict of interests between two (or more) other states, there is a difficult problem that cannot be satisfyingly dealt with by applying the law of the forum, which is the reasonable solution when the forum is interested. For these cases it is perhaps feasible to construct general principles for choice of law on a reasonable basis; thus far, however, I have been unable to visualize a satisfactory system.

Currie, *Comments on* Babcock v. Jackson, 63 Colum.L.Rev. 1233, 1242 (1963); *see also* Currie, *Conflict, Crisis and Confusion in New York,* 1963 Duke L.J. 1, 32–33. Apparently, the Seventh Circuit Court of Appeals, by fashioning a rule that requires the application of the place of injury in this context, was attempting to construct a choice of law rule to be applied universally in resolving the conflict when two nonforum states have equal interests in applying the law of their forum.

27. Contrary to the result that was reached by the *Chicago* Court, the decision in the case *sub judice* has not been altered by the fact that Michigan, as the place where the injury occurred, has a very small interest in applying its law in favor of MDC.

For the foregoing reasons, this Court believes that the Michigan choice of law rules mandate that, with regard to the issue of punitive damages, the law of Michigan shall apply to both Northwest and MDC.

### C

This Court now turns its attention to the punitive claims that were filed in Arizona and Florida. Both states apply the Restatement methodology to resolve choice of law issues. Under the Restatement approach, the law of the state where the injury occurred should apply in a wrongful death action unless another forum has "a more significant relationship" to the occurrence or to the parties. In essence, the states having legally significant contacts with regard to the issue of punitive damages and the relative interests involved under the Restatement approach parrot the contacts and interests presented under Michigan's choice of law approach in this case.

Therefore, because the conflicts analysis with regard to Arizona and Florida law is essentially the same as Michigan's conflicts analysis on this issue, this Court similarly concludes that Michigan law applies to the punitive damage claims against both Northwest and MDC.

In *Chicago,* the state where the injury occurred, Illinois, did not allow punitive damages in wrongful death cases. In addition, the *Chicago* court noted that the "purpose underlying the disallowance of punitive damage is protection of defendants from excessive liability." *Chicago,* 644 F.2d at 613. The Court reasoned, however, that because "Illinois has very strong interests in not suffering air crash disasters and also in promoting airplane safety, ... it would have a strong interest in allowing punitive damages to deter corporate misconduct relating to air safety." *Id.* at 615.

On a general level, every state and all persons desire to prevent air crash disasters which devastate the lives of so many persons. However, for purposes of choice of law analysis, the "interests" of a state with regard to a particular issue is gleaned from the policies that are reflected in the substantive law in question. With regard to the law of Illinois and Michigan concerning punitive damages, the policy within its laws are not regulatory policies but are corporation protection policies. These policies are not

### D

■ With regard to the actions filed in California, this Court concludes that the claims for punitive damages that have been filed against Northwest in the case at bar are also governed by Michigan law, while the punitive damage requests against MDC are governed by California law.

Applying California's "comparative impairment" approach to Northwest, it is quite evident that Michigan (place of injury) and Minnesota (principal place of business) once again have a legitimate interest in the application of its own law. As such, a "true conflict" exists. Neither state's law regarding punitive damages can be construed to be "archaic" or more progressive since the law on punitive damages in wrongful death cases varies considerably throughout the United States. In addition, there is a precise "fit" between the purpose which supports the law of Michigan and Minnesota and its application in the case at bench. However, Minnesota's regulatory and deterrence policy may be advanced by some means other than the application of its law in this case while Michigan's corporate protection policy cannot be similarly satisfied absent the application of its law.

Minnesota could further its corporation regulatory policy by initiating criminal prosecution against Northwest in certain

altered and transformed into regulatory policies based on the egregiousness of the tort involved in a particular case.

Further, the *Chicago* court concluded that Illinois has "a strong interest in air safety and in protection of air transportation corporations" on the punitive damage issue. *Id.* at 616. However, in the punitive damages context, a state may not have a regulatory and a corporation protection policy because these concepts are incongruous and diametrically opposite.

Regardless of whether this Court or the *Chicago* court correctly assessed the interest of Michigan and Illinois, both states were the sites of the accident and both denied the imposition of punitive damages. Therefore, the interest of Illinois in *Chicago,* and the interest of Michigan in the case at bar, are identical. The analysis in *Chicago,* which has been adopted by this Court, represents a reasoned and consistent manner in which to resolve a case wherein a true conflict exists between two non-forum states with equally compelling interests in applying its law.

circumstances. It was suggested in the *Chicago* case that Michigan could similarly further its corporation protective policy by allowing Northwest to insure against punitive damages. This Court believes, however, that while criminal sanctions would satisfy the regulatory and deterrence policies reflected in Minnesota's law, the mere availability of insurance against awards of punitive damages would not satisfy Michigan's protective policy.

By refusing to protect Northwest from excessive financial liability and instead allowing corporations to sustain the imposition of punitive damage awards, Michigan would be significantly increasing the cost of conducting business in its borders in the form of ever increasing insurance premiums. Such an alternative would contravene Michigan's policy of protecting corporations from excessive awards in order to stabilize and stimulate its local economy. Therefore, while the interests of both states would be impaired if the punitive damage law of the other state was applied, Michigan's interest would be more impaired under the California "comparative impairment" approach.

In addition, even if both states have equally strong commitments to their respective policies, this Court believes that California would invoke the *Chicago* rule, which represents a reasoned and consistent procedure for resolving a true conflict, and apply the law of the state of the accident. Therefore, the punitive damage law of Michigan shall apply to the conduct of Northwest.[28]

With regard to the punitive damage claims that have been raised against MDC by California claimants, this Court concludes that the California courts would apply its own law, thereby precluding an award of such damages.

The states having legally significant contacts for purposes of the punitive damage issue concerning MDC are Michigan (place of the accident), California (place of misconduct), and Missouri (principal place of business). As previously noted, both Michigan and California preclude punitive damage awards in wrongful death cases while Missouri permits wrongful death claimants to recover damages that are punitive in nature.

This Court has repeatedly stated that the application of Michigan's corporate protective law in favor of MDC would not further its interest in inducing corporation migration. A true conflict exists, however, between the interests of California and Missouri. This Court believes that a California court, if presented with this precise fact-law pattern, would conclude that its own interest would be most impaired by the application of another state's law. This Court reasons, therefore, that the punitive damage law of California would apply to the conduct of MDC under the "comparative impairment" approach.[29] Thus, with regard to the claims that were filed in California, the availability of punitive damages against MDC shall be governed by California law.

## V

On April 3, 1989, the PSC moved for a determination that the damages law of the transferor court will govern the transferred cases.[30] In its prayer for relief, the PSC merely requested "that the whole law of the forum in which each suit in this litigation was brought, including its choice

---

**28.** In a true conflict situation, it is impossible to determine whose state interest would be most impaired if its laws are not applied. Under such circumstances, a California court may choose to resolve the conflict by applying the law of the forum. Hence, California law would apply. Therefore, regardless of whether the California court would apply the law of the place of the injury or the law of the forum when presented with the true conflict, punitive damages would not be recoverable against MDC.

**29.** When presented with an irresolvable true conflict, the California courts may choose to apply (1) the law of the place of the injury, or (2) the law of the forum. Under either approach, punitive damage awards are unavailable.

**30.** On April 17, 1989, the PSC filed an "Amended Motion for a Determination that the Law of the Transferor Court, Including Its Choice of Law Rules, Will Govern the Transferred Cases With Respect to Damages."

of law rules, shall be applied to determine the compensatory damages to which each plaintiff is entitled." PSC's Amended Motion For A Determination That The Law Of The Transferor Court, Including Its Choice Of Law Rules, Will Govern The Transferred Cases With Respect To Damages at 11 (April 17, 1989).

On May 1, 1989, Northwest and MDC filed separate response briefs, in which they reasoned that the compensatory damages law of Michigan should apply to all cases that have been filed in this litigation.

Unfortunately, the parties provided this Court with an incomplete presentation of the conflict, if any, between the substantive laws of the involved states on the issue of compensatory damages. Without an awareness of the legal parameters of the substantive law in question, this Court cannot make the threshold determination of whether a conflict exists between the substantive laws of the involved states.

Therefore, this Court will (1) hold in abeyance any choice of law decision concerning compensatory damages, and (2) subsequently issue a briefing schedule on this issue in which the parties shall ascertain whether the laws of the involved states differ on the issue of compensatory damages and, if so, present a choice of law analysis consistent with this Order.

### VI

Both Defendants, MDC and Northwest, have moved to dismiss or for the entry of a partial summary judgment against all wrongful death claimants who seek punitive and exemplary damages.[31] This Court has determined that, with regard to the punitive damage claims alleged against MDC and Northwest, Michigan law shall apply to those cases which were filed in Michigan, Arizona, and Florida. Concerning those claims that were filed in California, this Court reasoned that Michigan law would apply to the claims against North-

west and California law would apply to the claims against MDC.

Because neither the law of Michigan or California allow wrongful death claimants to recover punitive damages, the motions of MDC and Northwest for a partial summary judgment on all wrongful death claims for punitive and exemplary damages must be granted.[32]

■ Orders for dismissal are also entered against those claimants who seek punitive damages in those cases that are governed by the Warsaw Convention. This Court recognizes that there is conflicting authority over whether the Warsaw Convention precludes awards of punitive or exemplary damages. *Compare Floyd v. Eastern Air Lines*, 872 F.2d 1462 (11th Cir.1989), *order stayed*, No. 86–5381 (11th Cir. June 5, 1989); *In re Air Crash at Gander, Newfoundland*, 684 F.Supp. 927 (W.D.Ky.1987); *Harpalani v. Air India, Inc.*, 634 F.Supp. 797 (N.D.Ill.1986) (punitive damages barred by Warsaw Convention) *with In re Aircrash in Bali, Indonesia*, 684 F.2d 1301 (9th Cir.1982); *Hill v. United Airlines*, 550 F.Supp. 1048 (D.Kan. 1982) (punitive damages not barred by Warsaw Convention). However, even if the Warsaw Convention does not preclude the recovery of punitive damages, the claimants in the instant case concede that such damages are available only when granted by local law. *See, e.g., Harris v. Polskie Linie Lotnicze*, 820 F.2d 1000, 1002 (9th Cir.1987); *Mertins v. Flying Tigers Lines*, 341 F.2d 851, 858 (2d Cir.), *cert. denied*, 382 U.S. 816, 86 S.Ct. 38, 15 L.Ed.2d 64 (1965). Since local law has been construed to preclude an award of punitive damages in this case, the Warsaw claimants are similarly precluded from pursuing such damages. *See, e.g., In re Aircrash in Bali, Indonesia*, 684 F.2d at 1315; *Cohen v. Varig Airlines*, 380 N.Y.S.2d 450, 85 Misc.2d 653 (N.Y.Civ.Ct.1975).

---

**31.** *See* Northwest's Motion to Dismiss All Claims Against It for Punitive or Exemplary Damages (July 17, 1989); MDC Motion to Dismiss or for Partial Summary Judgment (July 17, 1989).

**32.** This Court notes that the approval of the dismissal motions of Northwest and MDC does not address the merits of the punitive or exemplary damage claims of personal injury claimants.

## VII

At the expense of reiterating the well worn request of a weary judiciary, this Court urges the Congress to fashion a federal statutory methodology that will resolve conflict of law issues in an expedited, predictable, and uniform manner. The unpredictability of the current approach (1) prevents citizens from confidently structuring transactions, (2) precludes attorneys from accurately assessing the merits of a case at an early state of the litigation, thereby frustrating settlement negotiations, and (3) places an undue burden on judicial resources. The most noted choice of law scholar, the late Brainerd Currie, once stated years ago:

> The conflict of interest between states will result in different dispositions of the same problem, depending upon where the action is brought. If with respect to a particular problem this appears seriously to infringe a strong national interest in uniformity of decision, the court should not attempt to improvise a solution sacrificing the legitimate interests of its own state, but should leave to Congress, exercising its power under the full faith and credit clause, the determination of which interest should be required to yield.[33]

The federal judiciary has waited long for the Congress to relieve it of the burdens of *Klaxton Co., supra*. The immediate passage of a uniform law which will govern the issues of liability and damages in mass tort litigation, is an absolute necessity if an efficient administration of justice for resolving choice of law disputes is to be achieved.

IT IS SO ORDERED.

---

**33.** Currie, *Comments on Babcock v. Jackson*, 63 Columb.L.Rev. 1233, 1243 (1963).