DECISION RE: PUNITIVE DAMAGES
Before this Court are four related motions in limine, filed by the defendant, Ford Motor Company ("Ford"), regarding the admissibility of evidence relating to punitive damages in the underlying products liability action. By its first motion, Ford asks this Court to bar the plaintiff's claim for punitive damages because, Ford argues, Rhode Island choice-of-law rules dictate such a result. (See Ford's Mot. In Limine to Preclude Evidence Relating to Punitive Damages Based on R.I.'s Choice-Of-Law Rules and the Dormant/Negative Aspects of the Commerce Clause 1-2 [hereinafter Ford's Mot. Re: Choice-Of-Law].) Ford argues that Michigan is the sole state in this controversy with an interest in punishing Ford because Ford has its principal place of business there and because Michigan is where the alleged misconduct occurred. Ford suggests, therefore, that Michigan's policy to prohibit punitive damages should be effectuated by this Court. In the alternative, Ford argues that the "dormant" or "negative" aspects of the Commerce Clause of Article I of the United States Constitution prohibit application of Rhode Island's law on punitive damages.
In the remaining three motions, Ford argues (1) for the exclusion of all evidence relating to punitive damages because Dodson cannot establish the factual foundation necessary to support her claim, (2) for the exclusion of all evidence relating to punitive damages based, specifically, on Dodson's wrongful death claim, and, (3) in the event that punitive damages are awarded, for the exclusion of any evidence of Ford's corporate net worth in setting the award. (See Ford's Mot. In Limine to Preclude Evidence Relating to Punitive Damages Based On the Lack of Factual Foundation [hereinafter Ford's Mot. Re: Foundation]; Ford's Mot. In Limine to Preclude Evidence Relating to Punitive Damages Based On Dodson's Wrongful Death Claim [hereinafter Ford's Mot. Re: Wrongful Death]; Ford's Mot. In Limine to Preclude Evidence of Its Corporate "Net Worth" [hereinafter Ford's Mot. Re: Net Worth].)
The plaintiff, Carol Dodson ("Dodson"), in her capacity as executrix of the estates of the late Cecil and Doris Dodson ("the Dodsons"), counters Ford's arguments, asserting that Rhode Island law should be applied, and punitive damages allowed, because this state has a strong interest in protecting its citizens through the deterrence of conduct similar to that alleged here. Dodson concedes that punitive damages are not recoverable in a wrongful death action under Rhode Island law, but, otherwise, objects to Ford's motions. Accordingly, Ford's Motion Re: Wrongful Death is granted. For the reasons stated herein, however, this Court denies Ford's Motion Re: Choice-Of-Law, Ford's Motion Re: Foundation, and Ford's Motion Re: Net Worth.
 FACTS AND TRAVEL
In the underlying products liability action, Dodson seeks damages from Ford, alleging, inter alia, that the Dodsons' 1982 Ford Crown Victoria was defectively designed and manufactured. (Dodson's Fourth Am. Compl. 3-4.) Dodson alleges that Ford's defective design and manufacture of the vehicle caused the vehicle to catch fire, which, in turn, caused the Dodsons' Smithfield, Rhode Island home to catch fire. Dodson alleges that, as a result of the fire, Cecil Dodson sustained serious injury, and Doris Dodson died. (Id. at 4.) Dodson alleges that Ford knew of the defective design and manufacture of the vehicle prior to the fire but failed to notify the Dodsons of the defect. At all relevant times, the Dodsons were domiciled in and residents of the State of Rhode Island. Additionally, Ford, a Delaware corporation, maintained, and continues to maintain, its principal place of business in the State of Michigan.
 CONFLICT-OF-LAWS ANALYSIS
Initially, this Court must address Ford's position that a "false conflict" exists between Rhode Island and Michigan law regarding the imposition of punitive damages. A false conflict is present when either "(1) there is no true conflict of laws because only one state is interested in the application of its law or (2) the laws of the two states are found to be compatible." Engine Specialties, Inc. v. Bombardier, Ltd.,605 F.2d 1, 19 n. 26 (1st Cir. 1979). On the other hand, a "true conflict" exists when each state retains an interest in the application of their contradictory laws. Peavey Co. v. M/VANPA, 971 F.2d 1168, 1172 (5th Cir. 1992). Ford argues that Michigan's interest in promoting corporate financial stability — as reflected in its policy against punitive damages — is the only interest at stake in the instant matter and that, as a result, a false conflict exists between Rhode Island and Michigan law with regard to punitive damages. Ford's argument, however, is unpersuasive.
Although Michigan has expressed its strong interest in promoting the financial stability of businesses located there and the "overall economic well-being of its citizenry" by refusing to impose punitive damages, see In re Disaster at Detroit Metro.Airport, 750 F. Supp. 793, 805 (D. Mich. 1989), Rhode Island has conveyed a similarly strong, but directly contradictory position. By providing for punitive damages under circumstances where there is evidence of willful, reckless, or wicked conduct on the part of the party at fault so as to amount to "criminality," Rhode Island has demonstrated its preference to punish reprehensible tortfeasors and to deter similar future behavior. See Fenwickv. Oberman, 847 A.2d 852, 854 (R.I. 2004) (discussing the court's position on punitive damages and the standard of conduct to which such damages are applicable); Zarrella v. MinnesotaMutual Life Ins. Co., 824 A.2d 1249, 1262 (R.I. 2003) (noting that the purpose of punitive damages is to both punish and deter). Ultimately, not only does Rhode Island retain a policy interest in allowing punitive damages, its interest in punishment and deterrence is clearly at odds with Michigan's policy of foregoing punitive damages in the name of economic stability. Therefore, this Court is satisfied that a true conflict exists between the laws of Rhode Island and Michigan as to punitive damages, thereby necessitating a conflicts-of-law analysis under the law of Rhode Island. See Kelly v. Ford Motor Co.,933 F. Supp. 465, 468 (E.D.Pa. 1996) ("a real rather than false conflict exist[ed]" because Pennsylvania law allows punitive damages and Michigan law does not); In re Air Crash Disaster near Chicago,644 F.2d 594, 615 (7th Cir. 1981) (the "situation involve[d] a total and genuine conflict: one jurisdiction allows punitive damages, the other does not").
In dealing with conflicts-of-law, our Supreme Court has adopted an "interest-weighing" approach to determine which state's law to apply in a given case. Najarian v. National Amusements, Inc.,768 A.2d 1253, 1255 (R.I. 2001) (citing Woodward v. Stewart,104 R.I. 290, 299, 243 A.2d 917, 923, cert. denied,393 U.S. 957 (1968)). Under this method, the court looks at the facts of the particular case and determines the rights and liabilities of the parties "in accordance with the law of the state that bears the most significant relationship to the event and the parties."Id. (citing Cribb v. Augustyn, 696 A.2d 285, 288 (R.I. 1997) (per curiam) (quoting Pardey v. Boulevard Billiard Club,518 A.2d 1349, 1351 (R.I. 1986))).
"Factors which must be weighed in determining which law applies are `(1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law.'" Id. (quoting Pardey,518 A.2d at 1351 (citing Brown v. Church of the Holy Name ofJesus, 105 R.I. 322, 252 A.2d 176 (1969))). In tort cases, the following contacts are also to be considered: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. Id. (citing Brown, 105 R.I. at 326-27,252 A.2d at 179; Restatement (Second) Conflict of Laws § 145(2) (1971)). Finally, in personal injury actions, the law of the state where the injury occurred governs the rights and liabilities of the parties unless one state has a more significant relationship with respect to a particular issue. Id. (citing Blais v. AetnaCasualty Surety Co., 526 A.2d 854, 856-57 (R.I. 1987); Restatement (Second) Conflict of Laws § 146 (1971)).
Here, it is undisputed that the injury alleged by the plaintiff occurred in Rhode Island. This fact is especially significant in the conflicts-of-law analysis because, according to the Restatement (Second), although the importance of the different contacts varies depending on the nature of the tort involved, "the place of injury is of particular importance in the case of personal injuries." See Restatement (Second) Conflict of Laws
§ 145 cmt. f (1971). Additionally, it has been observed that "punitive damages are generally governed where the place of the wrong occurred" because "the state where the wrongdoing occurred will have the greatest interest in ensuring that such conduct by this defendant or others like him will not happen or be repeated." 1 Linda L. Schlueter, Punitive Damages § 4.1(B)(3) (5th ed. 2005) (citing Calhoun v. Yamaha Motor Corp., U.S.A.,216 F.3d 338 (3rd Cir. 2000); In re Air Crash Disaster NearChicago, 644 F.2d 594 (7th Cir. 1981); Whitmer v. El Paso S.W. Co., 20 F. 193 (5th Cir. 1912); Meehan v. Central R.R.,181 F. Supp. 594 (D.N.Y. 1960); Christensen v. Floriston Pulp Paper Co., 92 P. 210 (Nev. 1907)).
In Rhode Island, the place of the wrong is the state where the last event necessary to make the defendant liable for the alleged tort took place. See Busby v. Perini Corp., 110 R.I. 49, 51,290 A.2d 210, 211 (1972) (citing Kwasniewski v. N.Y., N.H. H.R.R., 53 R.I. 144, 164 A. 558 (1933); Pendar v. H. B. Amer.Mach. Co., 35 R.I. 321, 87 A. 1 (1913)). Here, the last event necessary to make Ford liable is the fire, which occurred in Rhode Island. As a result, Rhode Island's punitive damages law should apply unless Ford can demonstrate that Michigan has a more significant interest than Rhode Island in the application of its punitive damages law.[1]
Ford argues that the fact that Michigan is the place where the conduct causing the injury occurred "weighs heavily in favor of the application of Michigan law." Yet such a conclusion is not apparent after considering the relevant conduct. It is undeniable that a significant amount of the conduct that led to the Dodsons' alleged injuries occurred in Michigan. Ford allegedly defectively designed the Dodsons' Crown Victoria in Michigan, Ford manufactured that car in Michigan, and Ford made the decision not to recall the vehicle in Michigan. The alleged injury-causing conduct, however, clearly extends into Rhode Island. Dodson suggests that Ford knowingly placed the Dodson vehicle into the Rhode Island stream of commerce and knowingly failed to recall that car or warn its owners of the risks of the defect. Both Michigan and Rhode Island thus have legitimate claims that the conduct by Ford that caused the alleged injury occurred within its borders.
The domicile and place of business of the parties does not weigh significantly in favor of applying either Rhode Island or Michigan law. The decedents were both domiciliaries of Rhode Island while the defendant maintains its principal place of business in Michigan. Similarly, the place where the relationship between the parties is centered does not favor application of either state's law as there is no claim that the Dodsons purchased their vehicle directly from Ford.
Given the significant contacts that both Rhode Island and Michigan have with regard to the alleged conduct that caused the injury in this case, this Court cannot say that Michigan has a "more significant relationship" to the events at issue and the parties before this Court than Rhode Island. See Cooper v.American Express Co., 593 F.2d 612, 613 (5th Cir. 1979) (applying Alabama punitive damage law because the tortious invasion of privacy occurred in Alabama and Louisiana did not have a "more significant relationship . . . to the occurrence and the parties"). Moreover, the factor that is of primary importance, according the Restatement (Second), in a conflict-of-laws analysis in a tort action — the place of injury — squarely supports the application of Rhode Island's punitive damages law. See Calhoun v. Yamaha Motor Corp., U.S.A.,216 F.3d at 347 (holding that Pennsylvania's ties to the action, although relevant, did not outweigh Puerto Rico's interest as the situs of the injury).
Similarly, an analysis of the overarching legal considerations — predictability of results, maintenance of interstate order, simplification of the judicial task, advancement of the forum's governmental interests, and application of the better rule of law — does not demonstrate that Michigan has a "more significant relationship" than Rhode Island with respect to the issue of punitive damages. A central point of dispute between the parties is whether Rhode Island, the forum state, has a significant interest in the application of its punitive damage law. Ford asserts that Rhode Island has "no interest in the application of [its] law on punitive damages because [its] interest is limited to assuring just compensation to its residents, not punishing out-of-state corporations." (Ford's Mot. Re: Choice-Of-Law 12 (citing In re Disaster at Detroit Metro. Airport,750 F. Supp. 793, 805 (E.D. Mich. 1989))). In opposition, Dodson maintains that Rhode Island has a strong interest in the application of its punitive damages law because it is meant to protect the state's citizens and punish offenders in order to deter similar conduct in the future.
The cases cited by Ford for the proposition that a plaintiff's state's interest is satisfied once the plaintiff receives just compensation are distinguishable from the case at hand. With one exception, which will be discussed later, in none of those cases did the injury or the conduct that caused the injury occur in a state that allowed punitive damages. See In re "Agent Orange"Prod. Liab. Litig., 580 F. Supp. 690 (E.D.N.Y. 1984) (action brought by Vietnam War veterans and their families against manufacturers of the herbicide known as Agent Orange for injuries suffered by the veterans while in Vietnam caused by exposure to Agent Orange); In re Disaster at Detroit Metro. Airport,750 F. Supp. 793 (E.D. Mich. 1989) (suit based on deaths resulting from an airplane crash, where the plane took off from and crashed in Michigan, a state which does not allow punitive damages); In reAir Crash Disaster Near Chicago, 644 F.2d 594, 608 (7th Cir. 1981) (suit based on deaths resulting from an airplane crash, where the plane took off from and crashed in Illinois, a state that does not allow punitive damages). These cases stand for the proposition that when the injury and the conduct that caused the injury occur in a single state, that state, alone, has an interest in deterring the conduct that caused the injury.
Here, Dodson alleges that Ford's conduct in Michigan caused injury in Rhode Island. Rhode Island, therefore, has a strong interest in protecting its citizens from future conduct similar to that alleged to have been committed by Ford because the injury occurred in, and the alleged egregious conduct extended into, the state. See Peoples Bank and Trust Co. v. Piper AircraftCorp., 598 F. Supp. 377 (S.D. Fla. 1984) (applying Ohio law, despite the defendant's principal place of business being in Florida, because the plaintiff purchased and stored his aircraft in Ohio and because the crash and injury occurred in Ohio). More specifically, Dodson alleges that the Dodsons were injured in Rhode Island following a fire caused by a product known to be defective by its manufacturer, a company that consistently engages in business in the state. Despite knowledge of the defect, Dodson claims that Ford neither recalled the vehicle nor warned the Dodsons of the danger of their defective vehicle. Under these circumstances, an award of punitive damages would further Rhode Island's interest in protecting its citizens, through deterrence, because the financial penalty would emphasize the importance the state places on safety and corporate responsibility through its policy. In addition, Rhode Island's interests would be served through compensation to the plaintiff because, as the Restatement (Second) notes, "every tort rule is designed both to deter other wrongdoers and to compensate the injured victim." Restatement (Second) Conflict of Laws § 146 cmt. e (1971).
Despite the significant interest in punitive damages held by a state whose resident is injured within its territory, the United States District Court for the Eastern District of Pennsylvania, in Kelly v. Ford Motor Co., 933 F. Supp. 465 (E.D. Mich. 1996), a case with many facts analogous to this case, which Ford relies upon heavily in suggesting that Michigan law barring punitive damages should apply, chose to forego applying Pennsylvania law and, ultimately, to prohibit punitive damages in accordance with Michigan law. Initially, the court reasoned that Michigan's interest in prohibiting punitive damages to promote financial stability was equally valid to Pennsylvania's interest in punishing defendants through the imposition of such damages.Id. at 471. Thereafter, the court concluded that the relevant, "punitive" contacts weighed in favor of applying Michigan law because the conduct at issue for the purposes of punishment — the development, design, testing, and decision-making related to the alleged defective vehicle — all occurred in Michigan. Id. at 470.
The court's decision in Kelly is unpersuasive. Indeed,Kelly is regarded as the minority viewpoint for purposes of a conflicts-of-law analysis. See Symeon C. Symeonides, Lecture,Choice of Law for Products Liability: The 1990s and Beyond, 78 TUL. L. REV. 1247, 1268-69 (2004). According to Symeonides, in products liability cases such as Kelly, where the plaintiff's domicile, the place where the injury occurred, and the place where the product was sold are the same state, it is "appropriate" for courts to apply the "pro-plaintiff law of the plaintiff's home state, which was also the place of injury and the product's acquisition." Id. Symeonides reasons that:
 [a]s long as the product reached the particular state through ordinary commercial channels, then the application of that state's law is fair to the victim and not unfair to the defendant. A consumer who is injured in her home state by a product she has purchased there is entitled to the protection of that state's law, regardless of where the product was manufactured or by whom. Correspondingly, in a global market with free and predictable circulation of goods, the manufacturer who chooses to market his products in the plaintiff's state may not reasonably expect to carry with him the protective laws of the state of manufacture. One of the tradeoffs in entering a particular market and benefiting from it is the foreseeable and insurable risk of being held accountable under the higher product-liability standards of that market. As Peter Nygh put it, "[A] manufacturer should not be allowed to escape a higher risk by establishing itself in a low risk haven as a base for its activities."
Id. at 1269 (quoting Peter E. Nygh, The ReasonableExpectations of the Parties as a Guide to the Choice of Law inContract and Tort, in 251 RECUEIL DES COURS: COLLECTED COURSES OF THE HAGUE ACADEMY OF INTERNATIONAL LAW 269, 369 (1995)). Symeonides views Kelly as the exception to the rule. Id. at 1268-69. Kelly is an outlier case because the court's decision either ignored or overlooked Ford's choice to continually engage in business in Pennsylvania. Id. Applying Symeonides' reasoning, it would be appropriate for this Court, here, to apply Rhode Island law because Ford has chosen to market its products in Rhode Island and, thus, cannot reasonably expect to carry into Rhode Island the protective laws of Michigan. The application of Rhode Island law would not offend Michigan policy because Ford must foresee that Rhode Island, here, would apply its own law.
Kelly is distinguishable from the instant case, furthermore, because there is no indication from the Kelly decision that the case involved allegations that Ford knowingly placed defective/dangerous products into the Pennsylvania stream of commerce. The instant matter contains such allegations and, as a result, there is a greater nexus between Ford's alleged punitive conduct and Rhode Island as the state of the Dodsons' domicile and injury.
Another consideration in determining which state's law to apply is the "predictability of results." This inquiry seeks to establish whether the application of a particular state's law would have been more foreseeable under the alleged set of facts.See La Plante v. Am. Honda Motor Co., Inc., 27 F.3d 731 (1st Cir. 1994). The importance of this inquiry, however, should not be overemphasized as "it is often more important that good rules be developed than that predictability and uniformity of result be assured through continued adherence to existing rules." Restatement (Second) Conflict of Laws § 6 cmt. i (1971).
In analyzing the predictability of results factor in La Plante, the First Circuit concluded:
 Honda, a large multi-national corporation, cannot argue convincingly that it expected Colorado law to apply to a case arising from a product manufactured in Japan and involving a Rhode Island citizen simply because the product was originally sold in Colorado. . . . Consequently, Honda's justified expectations would not be upset by the application of Rhode Island law.
27 F.3d at 742. The same rationale applies here. Ford does not have a compelling argument that it would expect Michigan law to apply in a case where a Rhode Island resident is injured, in Rhode Island, by a product of a company that engages in substantial business in the state, simply because the product was designed and manufactured in Michigan.[2] Not only would such a result violate Rhode Island's significant interest in applying its laws, there would be considerable, inequitable, policy ramifications. If the laws of Michigan were to apply uniformly to any company with its principal place of business in the state, Michigan would be effectively imposing its policy against punitive damages on the rest of the country. Companies based in Michigan would be absolved of the threat of punitive damages and allowed to engage in "willful, reckless, or wicked conduct" in foreign states without regard for those states' policies or interests. Furthermore, even if it were reasonable to expect the consistent application of the law of the state in which the defendant maintains its principal place of business, the relative importance of the other factors — relative contacts and forum government's interests — would outweigh the predictability factor, as it is more important to develop equitable rules than predictable ones.
Two of the remaining factors — maintenance of interstate order and simplification of judicial task — do not weigh heavily in favor of the application of either Michigan or Rhode Island law. The final factor — application of the better rule of law — does, however, favor the application of Rhode Island law. Here, Rhode Island law is the better law. This is so not because Rhode Island's policy of permitting punitive damages when "a defendant's conduct requires deterrence and punishment over an above that provided in an award of compensatory damages" is superior to Michigan's policy of refusing to impose punitive damages to promote the financial stability of businesses located in Michigan and the "overall economic well-being of its citizenry." Fenwick v. Oberman, 847 A.2d 852, 855-56 (R.I. 2004) (per curiam) (quoting Palmisano v. Toth, 624 A.2d 314,318 (R.I. 1993)). Rhode Island law is the better law, here, because, were Michigan's law to be applied, the result would be that Ford and every other Michigan corporation would be immunized from accountability for its actions, even if its actions rose to the level of criminality. Rhode Island law, though permitting punitive damages, allows for punitive damages only upon "evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality that should be punished." Id. (quoting Bourque v. Stop Shop Cos., Inc.,814 A.2d 320, 326 (R.I. 2003)). Thus, though Rhode Island law does not eliminate the possibility of punitive damages, it remains sensitive to the concerns over the financial stability of businesses.
Rhode Island's policy permitting punitive damages and Michigan's policy preventing punitive damages are equally valid. Considering, however, that Rhode Island is the forum state, that it has superior contacts as the place of injury, place of domicile of the plaintiffs, and place of significant conduct by the defendant, and that Rhode Island law is the better rule of law, this Court finds that Rhode Island has a greater interest in applying its law and that Rhode Island law should be applied, and punitive damages allowed, in the instant action. Additionally, it should be noted that this Court's decision to allow punitive damages corresponds with the Rhode Island Supreme Court's exhibited preference for applying its own law. See Woodward v.Stewart, 104 R.I. 290, 243 A.2d 917 (1968) (applying Rhode Island law where two Rhode Island residents were engaged in a car crash in Massachusetts because "[t]he only reason that the [defendant's] car was in Massachusetts was that Interstate Route 195 was a convenient route between two Rhode Island communities"); Pardey v. Boulevard Billiard Club, 518 A.2d 1349
(R.I. 1986) (applying Rhode Island dram shop laws in an action against a local bar when a Massachusetts resident who had been drinking at the bar killed another Massachusetts resident in Massachusetts); Oyola v. Burgos, 864 A.2d 624 (R.I. 2005) (applying Rhode Island law, although the subject car accident took place in New York, in part because all four passengers were Rhode Island residents and the car involved in the crash was leased in Rhode Island); Cribb v. Augustyn, 696 A.2d 285 (R.I. 1997) (applying Rhode Island law where a fire caused damage to a New Hampshire home because both the owner of the property and the renters were Rhode Island residents and the parties' relationship was centered in Rhode Island); see also In re Disaster atDetroit Metro. Airport, 750 F. Supp. at 807-08 ("in those cases in which Michigan has a strong interest in applying its laws in order to implement its own policies, the Michigan courts would not displace its own laws in favor of the law from a foreign state"); but see Victoria v. Smythe, 703 A.2d 619 (R.I. 1997) (applying Florida law as it was considered the "better law" where Rhode Island law did not impose liability under the circumstances before the Court).
 II. THE DORMANT COMMERCE CLAUSE
In the alternative, Ford argues that the application of Rhode Island's law on punitive damages in this case would have the effect of regulating conduct outside of Rhode Island's borders in violation of the "dormant" or "negative" aspects of the Commerce Clause of Article I of the United States Constitution. This Court, however, is not persuaded by Ford's argument.
In support of its position, Ford relies upon the decisions of the United States Supreme Court in BMW of N. Amer. v. Gore,517 U.S. 559 (1996) and State Farm Mut. Automobile Ins. Co. v.Campbell, 538 U.S. 408 (2003). Ford notes that, in Gore, the Court held that "Alabama does not have the power . . . to punish BMW for conduct that was lawful where it occurred and that had no impact on Alabama or its residents. Nor may Alabama impose sanctions on BMW in order to deter conduct that is lawful in other jurisdictions." 517 U.S. at 572-73. Ford notes, further, that the Court in State Farm held that "[a] State cannot punish a defendant for conduct that may have been lawful where it occurred," and that "[a]ny proper adjudication of conduct that occurred outside Utah to other persons would require their inclusion, and to those parties, the Utah courts in the usual case, would need to apply the laws of their relevant jurisdiction." 538 U.S. at 421. On the basis of these quotations, Ford concludes that Rhode Island cannot, here, apply Rhode Island's law on punitive damages because Ford's alleged misconduct occurred exclusively in Michigan.
Ford's argument, however, fails to recognize that although the alleged misconduct — the design decisions by Ford's engineers and management and their decision not to notify the Dodsons of a defect in their vehicle despite Ford's knowledge of that defect — occurred in Michigan, the alleged misconduct had an impact on Rhode Island residents, including the Dodsons. As the Court ruled in State Farm, "Lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff." 538 U.S. at 422. Here, Dodson has established a nexus from Ford's conduct to the specific harm suffered by the Dodsons by alleging that Ford's design decisions and decision not to warn the Dodsons were the cause of the harm suffered by the Dodsons. The admission of evidence of Ford's out-of-state conduct, therefore, does not, per se, violate the "dormant" or "negative" aspects of the Commerce Clause.
Furthermore, Dodson has alleged that Ford engaged in out-of-state conduct, namely acting in a willful and reckless manner by knowingly distributing a defective car without warning to the Dodsons, which, unlike the conduct in Gore and StateFarm, would not be considered lawful in any jurisdiction. Because the application of Rhode Island's law on punitive damages, here, would punish a defendant for conduct that was unlawful where it occurred, Gore and State Farm do not apply. Accordingly, Ford's motion must be denied.
 III. FACTUAL FOUNDATION
In a separate motion, Ford argues for the exclusion of all evidence relating to punitive damages in the underlying products liability action because, Ford claims, Dodson cannot establish the factual foundation necessary to support her claim. This Court, however, is not persuaded by Ford's argument.
Ford argues that Dodson cannot establish the factual foundation necessary to support her claim on three separate grounds. First, noting that no Rhode Island decision has addressed the standard of proof required to establish an entitlement to punitive damages, Ford asserts that "the trend throughout the United States is to require proof of such an entitlement by clear and convincing evidence and [that] 31 of the states have adopted that as the standard of proof as to an entitlement of punitive damages." (Ford's Motion Re: Factual Foundation 3-4.) As Dodson notes in her objection, however, the recognized burden of proof in Rhode Island civil actions is a preponderance of the evidence, meaning that the jury must believe that the facts asserted by the proponent are more probably true than false. See Parker v.Parker, 103 R.I. 435, 442, 238 A.2d 57, 60 (1968) ("satisfaction by a `preponderance of the evidence' [is] the recognized burden [of proof] in civil actions"). This Court is bound by Rhode Island Supreme Court precedent unless and until the Supreme Court changes the law. See Cunningham v. Edwards, No. NC 89-0410, 1990 R.I. Super LEXIS 194, *11 ("This Court is bound to follow not only the rulings of the [Rhode Island] Supreme Court, but its reasoning as well").
Furthermore, Rhode Island applies rigorous substantive and procedural standards that protect defendants from arbitrary and excessive awards. As a result, there is no need to elevate the burden of proof to establish an entitlement to punitive damages from a preponderance of the evidence, as ordinarily applied in civil cases, to the more exacting standard of clear and convincing evidence.
In Rhode Island, parties seeking punitive damages must produce "evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality that should be punished." Fenwick, 847 A.2d at 855-56 (quotingBourque, 814 A.2d at 326). Punitive damages are awarded "only in the rare circumstances when `a defendant's conduct requires deterrence and punishment over and above that provided in an award of compensatory damages.'" Id. (quoting Palmisano,624 A.2d at 318). "[W]hether a party has met this rigorous standard is a question of law" to be determined, preliminarily, by the trial justice. Palmisano, 624 A.2d at 318. If the trial justice determines that the evidence justifies a punitive damages award, the trier of fact then determines whether and to what extent such damages should be awarded. Id. In light of past precedent and the rigorous substantive and procedural standards that protect defendants from arbitrary and excessive awards, this Court is loath to adopt a new and unnecessary rule of law.
Ford's second argument is that Dodson cannot establish the factual foundation necessary to support her claim because Ford is a corporate entity, which, according to Ford, means that Dodson must prove that, at the time the 1982 Crown Victoria was designed and manufactured, Ford's officers, directors, managing agents or other high-ranking corporate officials who had power to make corporate policy, acted with actual malice toward the Dodsons. Ford's argument, however, is a misstatement of Rhode Island law.
In jurisdictions applying the "corporate complicity" theory, a jury may not award punitive damages against a corporation on a theory of respondeat superior. See, e.g., Jannotta v. SubwaySandwich Shops, Inc., 225 F.3d 815, 818 (7th Cir. 2000). Rather, the plaintiff must show that the responsible employee was acting in a managerial capacity or that his or her acts were authorized or ratified by the corporation. See id. Rhode Island has not adopted and does not follow the corporate complicity theory.See Emery-Waterhouse Co. v. R.I. Hosp. Trust Nat'l Bank,757 F.2d 399, 407-08 (1st Cir. 1985) (affirming award of punitive damages against a bank based on the conduct of its officers and employees); Bourque, 814 A.2d at 326 (affirming award of punitive damages against a company based on the conduct of store detectives). Ford's second argument, therefore, is based on an inaccurate representation of Rhode Island law. Accordingly, the argument fails.
Ford's third argument is that Dodson has not and cannot establish a basis for the award of punitive damages because, Ford claims, Dodson cannot establish that a single fire in a 1982 Crown Victoria was caused by the ignition switch or that anyone at Ford acted in some quasi-criminal manner that would warrant the award of punitive damages. Ford's argument is a mere three sentences long and lacks any supporting analysis or authority. As such, this Court need not address Ford's argument. See Statev. Thornley, 319 A.2d 94, 97 (R.I. 1974) ("[A] contention if it is to be meaningful, requires briefing and argument, and a mere challenge without analysis, discussion, or citation of authority is meaningless. The defendant here has merely stated an argument without any analysis or authority therefor.) If asked, this Court may revisit the issue of whether Dodson can, in fact, establish a basis for the award of punitive damages once there is admissible evidence before the Court upon which that determination may be made. Presently, Ford's three arguments for the exclusion of evidence relating to punitive damages because Ford cannot establish the factual foundation necessary to support her claim fail. Ford's Motion Re: Factual Foundation is thus denied.
 IV. EVIDENCE OF CORPORATE NET WORTH
Finally, Ford argues that, assuming punitive damages are awarded to Dodson, evidence of Ford's net worth should be excluded as irrelevant and unfairly prejudicial or, at minimum, should be limited to the profits derived from sales of the 1982 Crown Victoria within Rhode Island. As before, this Court is not persuaded by Ford's argument.
In its motion, Ford argues that the purpose of punitive damages — to punish and deter the wrongdoer — is not furthered by the award of punitive damages against a corporation because, Ford asserts, punitive damages against the corporation punish the shareholders and customers of the corporation, not the corporation, and because punitive damages against the corporation, which are absorbed by the corporation, fail to further the purpose of deterring employee misconduct. Ford claims, therefore, that awarding punitive damages in this case would accomplish none of the objectives that punitive damages are intended to further. As a result, Ford argues that all evidence of Ford's net worth should be excluded because if punitive damages are improper, then Ford's net worth is irrelevant, and, alternatively, because the probative value of Ford's net worth is exceeded by the unfair prejudice that would result if such evidence were admitted.
Ford's argument fails, however, because, as Ford acknowledges in its motion, "[u]nder Rhode Island law, reference to a defendant's wealth is proper where punitive damages are sought."Emery-Waterhouse, 757 F.2d at 410; Palmisano,624 A.2d at 320. In fact,
 [t]he vast majority of states [that] have considered the issue of whether the trier of fact may also consider the wealth of the defendant in fashioning a punitive damage award have determined that the defendant's wealth is an appropriate consideration because the degree of punishment or deterrence is to some extent proportionate to the means of the wrongdoer.
Annotation, Punitive Damages: Relationship to Defendant's Wealthas Factor in Determining Propriety of Award, 87 A.L.R.4th 141 (2005).
As Dodson argues in her objection, the propriety of the introduction of the defendant's net worth is not, contrary to Ford's argument, restricted by the Commerce Clause or the United States Supreme Court's holdings in Gore or State Farm. As the Court noted in State Farm,
 [Wealth] provides an open-ended basis for inflating awards when the defendant is wealthy. . . . That does not make its use unlawful or inappropriate; it simply means that this factor cannot make up for the failure of other factors, such as `reprehensibility,' to constrain significantly an award that purports to punish a defendant's conduct.
538 U.S. at 427-28 (quoting Gore, 517 U.S. at 591 (Breyer, J., concurring)). Stated simply, use of wealth in determining punitive damages is not unlawful or inappropriate, but the wealth of the defendant cannot justify an otherwise unconstitutional punitive damage award. Id. (citing Gore, 517 U.S. at 585). Regardless of the defendant's wealth, the award of punitive damages must be reasonable and proportionate to any award of compensatory damages. Id. at 428.
This Court finds, therefore, that evidence of Ford's net worth is relevant with regard to the calculation of punitive damages, and Ford has failed to show that reference to its net worth in this case is unfairly prejudicial. Furthermore, just as the Commerce Clause does not prevent the application of Rhode Island's law on punitive damages in this case, the Commerce Clause does not prevent the consideration of Ford's net worth in calculating punitive damages. As a result, evidence of Ford's net worth may be admitted for that limited purpose, provided that Dodson first demonstrates that she is entitled to punitive damages.
 CONCLUSION
In conclusion, for the above stated reasons, Ford's Motion Re: Wrongful Death is granted. This Court, however, denies Ford's Motion Re: Choice-Of-Law, Ford's Motion Re: Foundation, and Ford's Motion Re: Net Worth.
[1] In Kramer v. Showa Denko K.K., 929 F. Supp. 733, 741
(S.D.N.Y. 1996), the United States District Court for the Southern District of New York held that where "defendant's negligent conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong [for choice-of-law purposes] is considered to be the place where the last event necessary to make the actor liable occurred." In that case, the defendant, Showa Denko K.K. ("SDK") asserted that "Japan, as SDK's place of incorporation and principal place of business as well as the location of manufacture and testing of the product at issue," was the situs of SDK's tortious conduct.Id. The court held, however, that New York was the locus of the alleged tort because the plaintiff had purchased and ingested the product that allegedly caused the plaintiff's injuries in New York. Id.
[2] See Eugene F. Scoles, Conflict of Laws § 17.68, at 830 (3rd ed. 2000) ("what tips the balance in favor of the application of the law of the injury-state is the fact that the product was sold in that state through ordinary commercial channels. In turn, this means that the imposition of the financial burden of punitive damages was a foreseeable and insurable risk which the manufacturer should expect to bear in exchange for deriving financial benefits from that market").