DECISION
Before this Court is several Defendants'[1]
(collectively "Defendants") Motion to Apply Foreign Law. Plaintiffs Michael D. Carlson and Mary L. Carlson (collectively "Plaintiffs") object to this motion. This Court afforded the parties an opportunity to be heard on March 29, 2011. Jurisdiction is pursuant to G.L. 1956 § 8-2-14.
 I Facts and Travel
Plaintiffs allege that David S. Carlson ("Mr. Carlson") was exposed to Defendants' manufactured asbestos-containing products, which caused and/or contributed to his development of mesothelioma. The alleged exposure occurred in Michigan, where Mr. Carlson lived for the majority of his life. Specifically, Plaintiffs allege that Mr. Carlson was exposed to asbestos-containing products from 1961 through 1968 when he was working as a laborer and mason's assistant for Carlson Construction in Ostego, *Page 2 
Michigan. Plaintiffs additionally claim that Mr. Carlson was exposed to asbestos when he worked as a bus driver in Big Rapids, Michigan and at various other jobs in Michigan from 1973 to 1979. Mr. Carlson also was present at the Naval Construction Battalion Center in Davisville, Rhode Island and Naval Air Station Quonset Point in Quonset Point, Rhode Island in 1969. Plaintiffs, however, do not allege any asbestos-exposure through that service.
In 1992, Mr. Carlson moved to Pennsylvania, where he was diagnosed with mesothelioma. He received his mesothelioma related treatment and remained there until his death in 2009.
In their motion, Defendants argue that this Court should apply Michigan substantive law to this claim because Rhode Island does not have sufficient minimum contacts with the matter and, therefore, application of this state's law would be unconstitutional. Defendants further argue that the interest-weighing choice-of-law analysis significantly weighs in favor of Michigan law.
In response, Plaintiffs contend that Defendants waived their right to raise the issue of Michigan law because they did not give reasonable notice of their intentions to raise a motion to apply foreign law. Plaintiffs further argue that Defendants' motion is premature because they did not frame to which issue Michigan law must apply. Finally, Plaintiffs maintain that the interest-weighing choice of law approach mandates that Pennsylvania law applies. *Page 3 
 II Analysis A Waiver of the Application of Foreign Law
As a preliminary matter, Plaintiffs contend that Defendants waived their right to apply foreign law under Super. R. Civ. P. 44.1. Plaintiffs argue that Defendants' notice of their intention to raise an issue concerning the law of a foreign country or state was neither reasonable nor timely because after giving that notice, Defendants filed motions in which Rhode Island law was asserted as the basis of relief.
Rhode Island Rule of Civil Procedure 44.1 provides that "[a] party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice." Although that rule speaks to law of a foreign country, the Rhode Island Supreme Court has held that the "committee notes to that rule make it clear that the intention was to require notice in any case involving law of foreign country or state." Rocchio v.Moretti, 694 A.2d 704, 706 n. 2 (R.I. 1997). In addition, G.L. 1956 § 9-19-6 provides that, "any party may also present to the trial court any admissible evidence of foreign laws, but to enable a party to offer evidence of the law in another jurisdiction or to ask that judicial notice be taken thereof, reasonable notice shall be given to the adverse parties either in the pleadings or otherwise."
Under this Rule, a party must give timely notice to the opposing party and hearing justice of its intention to apply foreign law to avoid unfair surprise to the parties and to provide a uniform method of raising and addressing the application of foreign law.See Rocchio, 694 A.2d at 706; Robert B. Kent et al.,Rhode Island Rules of Civil and *Page 4 Appellate Procedure with Commentaries § 44.1 (2006); James WM. Moore, 9 Moore's FederalPractice § 44.1 (2011).[2] The failure to give proper notice under this Rule does not warrant dismissal of the case, rather it results in a waiver of the applicability of the foreign law. 9 Moore's Federal Practice 3d § 44.1; seealso Rocchio, 694 A.2d at 706 n. 2 (finding that plaintiffs' failure to provide notification of their intention to request the application of foreign law waives any argument on the application of foreign law). Nevertheless, to discourage formalisms, Super. R. Civ. P. 44.1 does not set any definite time limit on this notice. Wright Miller, 9A Federal Practice and Procedure, Civil 3d § 2443 (2010); see also Rationis EnterprisesInc. of Panama v. Hyundai Mipo Dockyard Co., Ltd.,426 F.3d 580, 585 (2nd Cir. 2005) (stating that "Congress deliberately declined to provide `any definite limit on the party's time for giving the notice of an issue of foreign law'" (quoting Fed.R.Civ.P. 44.1 advisory committee's note,39 F.R.D. 69, 118 (1966))). The Rule also does not require any specific method of notice; the notice can come from a pleading or any other writing. Wright Miller, 9A Federal Practice andProcedure, Civil 3d § 2443.
The notice required by Super. R. Civ. P. 44.1 is significantly different from an argument. Rationis Enterprises Inc. ofPanama, 426 F.3d at 585-86. Specifically, Rule 44.1 "notice merely call[s] attention to the fact that the issue will beraised, whereas argument lays out . . . the provisions of foreign law, the basis for its relevance, and the *Page 5 
application of the foreign law to the case."Id. (emphasis added). Indeed, this notice does not serve to "`spell out the precise contents of foreign law but rather to inform the court and litigants that it is relevant to the law suit.'"Id. (quoting Wright Miller, Federal Practice andProcedure 3d § 2443). Accordingly, a party must provide notice of its intention to apply foreign law, but does not have to flesh out its argument at that time. Id.
In this case, Defendants in the above-captioned matter[3]
provided their Rule 44.1 notice on February 17, 2010, February 24, 2010, and June 24, 2010. Following this notice, certain Defendants filed various motions under Rhode Island law. On January 21, 2011, Defendants filed their Motion to Apply Foreign Law.
Although Defendants' use of Rhode Island law in their motions following their notice of intent may cause confusion as to the applicable law, [4] they followed the procedural requirements of Rule 44.1 by filing a notice of intent to apply foreign law.See Super. R. Civ. P. 44.1. In this type of mass tort, the complex and highly-fact dependent choice of law analysis is rarely managed by uniform deadlines, findings of waiver, or bright-line rules. See Rationis Enterprises Inc. of Panama,426 F.3d at 586 (explaining choice of law analysis in terms of maritime mass tort cases). Thus, in giving notice to the parties of their intention to apply foreign law, Defendants were not required to argue for its application at that time. Defendants' notice additionally prevented any unfair surprise by warning both the Court and the opposing parties of the possibility of *Page 6 
the application of a foreign state's law. Accordingly, Defendants properly filed their 44.1 notice and did not waive their right to apply foreign law.
 B Doctrine of Depecage
Plaintiffs further aver that Defendants' motion is premature because Defendants were required to specifically address the issues to which Michigan law applies. For this proposition, Plaintiffs rely on La Plante v. American Honda Motor Co., Inc., which stated that "Rhode Island ascribes to the principles of depecage in tort cases." 27 F.3d 731, 741 (1st Cir. 1994) (citing PutnamResources v. Pateman, 958 F.2d 448, 465 (1st Cir. 1992)). The doctrine of depecage allows courts to resolve each substantive issue in one tort matter through the application of laws of different states when the choices influencing the conflicts-of-law determination differ by issue. Id. (citing Pateman,958 F.2d at 465; Ashland Oil, Inc. v. Miller Oil PurchasingCo., 678 F.2d 1293, 1304 (5th Cir. 1982)); seealso Restatement (Second) Conflict ofLaws § 145, cmt. d (1971) ("[C]ourts have long recognized that they are not bound to decide all issues under the local law of a single state.").
The Rhode Island Supreme Court has yet to explicitly address the doctrine of depecage. Pateman, 958 F.2d at 465. It has nevertheless demonstrated that it "adheres to that principle in the tort context." Id. For example, in Oyola v. Burgos, the Rhode Island Supreme Court ruled that Rhode Island law governed the issue concerning who are the proper parties and whether a defendant could face liability, but the issue of negligence could be governed by New York law. See 864 A.2d 624, 628 (R.I. 2005). To that effect, in Woodward v. Stewart, the Court found that "defendants' alleged wrongful conduct is *Page 7 
to be judged by the law of Massachusetts and the host's duty of care to his passengers and the measure of damages to be applied is to be governed by the law of Rhode Island."104 R.I. 290, 293-94, 243 A.2d 917, 920 (1968); seealso Pateman, 958 F.2d at 465 (employingWoodward as an example of a case in which the Rhode Island Supreme court chose to apply depecage).
That proposition, however, does not bar Defendants from arguing for the application of a foreign state's law on a global scale.See, e.g., Taylor v. Massachusetts Flora Realty,Inc., 840 A.2d 1126, 1129 (R.I. 2004) (applying Massachusetts substantive law to plaintiff's appeal); Najarian v. NationalAmusements, Inc., 768 A.2d 1253, 1255 (R.I. 2001) (applying Massachusetts substantive law to plaintiff's negligence action). Instead, the doctrine of depecage merely means that this Court is not bound to decide every issue under one state's law. SeeWoodward, 104 R.I. at 293-94, 243 A.2d at 920; Restatement (Second) Conflicts of Law § 145, cmt. d. Accordingly, Defendants' motion is neither premature nor improper merely because they moved for Michigan law to apply to the entire matter and did not specify by particular issues.
 C Constitutionally Minimum Connection
At the outset, this Court notes that "the deference accorded a plaintiff's choice of forum has never been intended to guarantee that the plaintiff will be able to select the law that will govern the case." Piper Aircraft Co. v. Reyno,454 U.S. 235, 256 n. 24 (1981). Instead, in Rhode Island, courts use an interest-weighing approach to determine the appropriate law to apply when several states with conflicting laws have an interest in a *Page 8 
matter. Oyola, 864 A.2d at 627 (citing Woodward,104 R.I. at 299-300, 243 A.2d at 923). In this approach, courts must decide which "state `bears the most significant relationship to the event and the parties.'" Najarian v. National Amusements,Inc., 768 A.2d 1253, 1255 (R.I. 2001) (quoting Cribb v.Augustyn, 696 A.2d 285, 288 (R.I. 1977)). As a threshold matter, this Court must reconcile the possibility of using an interested state's law with the Full Faith and Credit, Due Process, and Equal Protection clauses of the Federal Constitution, which require that the forum has some rational basis for applying its laws to the matter. Woodward, 104 R.I. at 296, 243 A.2d at 921.
To apply the substantive law of a state, that state must have at least some actual contact with the claim. Id. In the present matter, although Rhode Island is a proper forum state, its only actual contact to Plaintiffs' claims is the "generalized interest that is constant throughout the United States and beyond,viz., the interest in preventing asbestos-related diseases."Kedy v. A.W. Chesterton Co., 946 A.2 1171, 1188 (R.I. 2008);see also Phillips Petroleum Co. v. Shutts,472 U.S. 821 (1985) (finding that a state "may not use [the] assumption of jurisdiction as an added weight in the scale when considering the permissible constitutional limits on choice of substantive law"). Accordingly, this Court concurs with Plaintiffs and Defendants that Rhode Island lacks a rational basis for applying its laws. This Court, therefore, cannot constitutionally apply this state's law.
Both Defendants and Plaintiffs acknowledge that Michigan has the appropriate minimum contacts with this matter. Michigan, as the state of Mr. Carlson's exposure and his domicile until 1992, provides this Court with a rational basis for applying its laws. Plaintiffs further aver that Pennsylvania has the requisite minimum contacts with the *Page 9 
instant case. This Court agrees. Pennsylvania, as the state where Mr. Carlson was diagnosed and treated for mesothelioma from 1992 until his death in 2009, also has the constitutionally required minimum contacts for the application of its law. Thus, this Court must determine whether Pennsylvania or Michigan has the most significant interest in this litigation.
 D Interest Weighing Analysis
A court need not engage in a choice-of-law analysis when no conflict-of law issue is presented. NationalRefrigeration, Inc., 942 A.2d at 973 (R.I. 2008). Neither party provided this Court with information about potential conflicts between Pennsylvania and Michigan. Nevertheless, Super. R. Civ. P. 44.1 provides that "the court, in determining foreign law, may consider any relevant material or source . . . whether or not submitted by a party or admissible under the Rhode Island Rules of Evidence." This Court is aware of the evident conflict of laws between Michigan and Pennsylvania in this case, including, but not limited to, significant differences in the approach to joint and several liability, [5] the application of strict liability in products liability cases, [6] and a limitation for non-economic loss recovery.[7] *Page 10 
Under Rhode Island's conflicts-of-law analysis, this Court will employ an interest-weighing approach to determine which law to apply as several states have an interest in a matter. SeeOyola, 864 A.2d at 627 (citing Woodward,104 R.I. at 299-300, 243 A.2d at 923); Najarian,768 A.2d at 1255. The factors that a court must weigh in determining which law applies are "`(1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law.'" Najarian, 768 A.2d at 1255 (quotingPardey v. Boulevard Billiard Club,518 A.2d 1349, 1351 (R.I. 1986)) (citing Restatement (Second)Conflict of Laws § 145(2) (1971)). *Page 11 
Specifically in a tort matter, determining the forum with the most significant relationship to the claim requires a court to evaluate the following contacts: `(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.'"Id. (quoting Brown v. Church of the Holy Name ofJesus, 105 R.I. 322, 326-27, 252 A.2d 176, 179 (1969)) (citing Restatement (Second) Conflict of Laws § 145(2)).
 1 Application of Tort Specific Interest WeighingFactors a Place Where Injury Occurred
Defendants argue that all of Mr. Carlson's alleged injuries occurred in Michigan, and, therefore, Michigan has the most significant interest. Plaintiffs, however, contend that the place of exposure is not a factor to be considered in the choice-of-law analysis. Instead, they argue that Pennsylvania is the place where the injury occurred because Mr. Carlson received his diagnosis of and his treatment for mesothelioma in Pennsylvania and died in that state.
The Rhode Island Supreme Court abandoned the doctrine of lexloci delicti[8] because "the interest-weighing approach to conflict of law cases is indeed the better rule, and justice will be more equitably administered if the Rhode Island courts apply that rule to tort conflicts cases coming before them."Woodward, 104 R.I. at 299, 243 A.2d at 923. Nevertheless, in a personal injury matter, "`the local law of the state where the *Page 12 
injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship. . . .'"Najarian, 768 A.2d at 1255 (omission in original) (quotingBlais v. Aetna Casualty Surety Co.,526 A.2d 854, 856-57 (R.I. 1987)).
Mesothelioma is a slow-developing disease[9] resulting in a question of when the injury, in fact, occurred. In this case, Mr. Carlson was exposed to asbestos in Michigan, but diagnosed in Pennsylvania, where he lived until his death. Courts have differed as to what constitutes a place of injury for a slow-developing disease like mesothelioma. Compare Clayton v. Eli Lilly andCo., 421 F.Supp.2d 77, 79-80 (D.D.C. 2006) (finding that Alabama law applied because plaintiff, diagnosed in Puerto Rico, was exposed to the drug there); Rice v. Dow Chem. Co.,875 P.2d 1213, 1218-19 (1994) (applying the law of *Page 13 
the state of exposure to herbicide, rather than the state in which plaintiff developed leukemia), with Renfroe v. Eli Lilly andCo., 686 F.2d 642, 645 (8th Cir. 1982) (finding that the injury begins when the latently developing disease is detected);Wyeth v. Rowatt, 244 P.3d 765, 776-77 (Nev. 2010) (finding that the law of Nevada, where plaintiffs were diagnosed, applied to the case, not the law of the state where they received the therapy at issue). In Rhode Island, the location of the injury is where the last event necessary to make Defendants liable for the alleged tort took place. See Busby v. Perini Corp,110 R.I. 49, 51, 290 A.2d 210, 211 (1972) (citations omitted);see also Kramer v. Showa Denko K.K.,929 F. Supp. 733, 741 (S.D.N.Y. 1996) ("[W]here defendant's negligent conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong [for choice-of-law purposes] is considered to be the place where the last event necessary to make the actor liable occurred." (citations and internal quotations omitted)).
In the context of a latently developing disease, this Court adopts the view that the last event necessary for a claim against a tortfeasor is the recognition of that disease and the onset of symptoms, as there is "no legally compensable injury to sue upon" until the detection of the disease. Wyeth, 244 P.3d at 776;see also Hanson v. Singsen,898 A.2d 1244, 1249 (R.I. 2006) (stating that in medical malpractice cases, when an injury remains latent for years, the statute of limitations begins to run when "the plaintiffs knew or should have known of the wrongful act that is the basis of their lawsuit" (quoting Ashey v. Kupchan, 618 A.2d 1268, 1269 (R.I. 1993))). The injuries in these types of cases are not based on the moment of exposure; rather, they are based on the mesothelioma, the resulting treatment, and its consequences. See Renfroe,686 F.2d at 647; Wyeth, 244 P.3d at 776. *Page 14 
For example, Nevada law applied to the Wyeth matter, in which the plaintiffs were diagnosed with cancer in Nevada, but were exposed to the alleged defective estrogen plus progestin therapy while living in other states. See 244 P.3d at 776-77. TheWyeth Court particularly noted that plaintiffs' cancer diagnoses were the last event necessary for their suit because their claims were based on the development of this cancer and resulting treatment. Id. at 776, 777.
In the instant case, Mr. Carlson was exposed to the asbestos from 1961 to 1968 and from 1973 to 1979 in Michigan. Nevertheless, his symptoms developed, and he was diagnosed with mesothelioma in Pennsylvania. Thus, the last event necessary occurred in Pennsylvania, where Mr. Carlson became ill, because Mr. Carlson had no legally compensable injury to sue upon until his illness developed. See id.; see also Restatement (First) Conflict of Law § 377 ("Where a person causes another voluntarily to take a deleterious substance which takes effect within the body, the place of wrong is where the deleterious substance takes effect and not where it was administered."). Furthermore, Plaintiffs' claims are based on the development and consequences of mesothelioma, not on any effects at the instant he was exposed to the asbestos-containing products. SeeWyeth, 244 P.3d at 776, 777. Accordingly, Mr. Carlson's location of his injury is Pennsylvania.[10] Thus, this matter involves Pennsylvania' significant interest in protecting its residents from injury.
 b *Page 15 Location of Conduct Causing the Injury and the Domicile, Residence, Nationality, Place of Incorporation and Place of Business of the Parties
Under the following two factors the location of conduct causing the injury and the domicile of the parties, Plaintiffs argue that Pennsylvania, as both the domicile of Mr. Carlson and principal place of business for a number of Defendants, has a significant interest in this litigation. Mr. Carlson was domiciled in Pennsylvania at the time of his death and for seventeen years prior. Additionally, CertainTeed's principal place of business is Pennsylvania.
In La Plante, a products liability action, the First Circuit Court found that the tortuous conduct allegedly giving rise to the plaintiff's injuries occurred in Japan where the subject product was designed and its warnings devised. 27 F.3d at 741 (citing Price v. Litton Sys., Inc.,784 F.2d 600, 604 (5th Cir. 1986)). But see Byers v. LincolnElec. Co., 607 F.Supp.2d 840, 851 ("[I]n a product liability case for failure to warn, the first factor and second factor in a choice-of-law analysis are equivalent."). In this case, the subject products were manufactured throughout the country, [11] with some in Pennsylvania. Additionally, the principal places of businesses of these companies do not lie completely in one state; however, CertainTeed's principle place of business is Pennsylvania. From this Court's review of the provided evidence, neither moving Defendant manufactured their products at issue or had principal places of business in Michigan. Thus, this factor *Page 16 
slightly weighs in favor of Pennsylvania because its interest is implicated in regulating the conduct of its domiciled companies.See, e.g., Musser v. Vilsmeier Auction Co.,Inc., 562 A.2d 279, 281 (Pa. 1989) (stating that in the strict products liability context the "`basis of the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods" (quoting Restatement (Second) Torts § 402A cmt. f)). Nevertheless, this Court cannot disregard Michigan's involvement in Mr. Carlson's disease, as his alleged exposure took place only in that state. Thus, under this factor, Michigan also has a significant interest in this matter because of a state's interest in regulating the products that enter its borders.
Mr. Carlson was a Pennsylvania resident for the seventeen years prior to his death; Pennsylvania's interest is, therefore, involved to compensate and protect its residents. See, e.g.,Musser, 562 A.2d at 281 ("[T]he affixation of strict liability for damages caused by defective products . . . is based on policy which has as its purpose the protection of the public against the harms such defects engender."); Andaloro v. Armstrong WorldIndustries, Inc., 799 A.2d 71, 81 (Pa. Super. 2002) (stating that the policy of joint and several liability "reflects Pennsylvania's commitment, often reaffirmed in [its] appellate courts that `the plaintiff should be fully compensated for his injuries'" (quoting Baker v. ACS, Inc.,729 A.2d 1140, 1151 (Pa. Super. 1999))). Pennsylvania's laws specifically ensure that their residents, Mr. Carlson in this case, are compensated through their non-economic damages allowance and strict liability policy. *Page 17 
Thus, as a result of Mr. Carlson's domicile, Pennsylvania has a significant interest in this litigation.
 d Place Where the Relationship, if Any, Between the Parties Is Centered
Concerning the last tort-specific factor, the First Circuit has noted that in a products liability action, "there being no `relationship' between the parties in the ordinary sense of the word, this factor is unhelpful in making a choice-of-law determination." La Plante, 27 F.3d at 741. Similarly, in this case, this Court finds no evidence of any actual, arms-length relationship between Plaintiffs and the Defendants. Mr. Carlson came into contact with these products as a result of his employment. As such, this fourth specific torts factor is not useful to this Court's choice of law analysis.
 2 Application of General Interest-Weighing Factors
The choice of law analysis may not always turn on the quantity of contacts, but rather, the qualitative nature of those contacts affected by the following factors: "(1) predictability of results; (2) maintenance of interstate order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law."Id. (citing Brown, 252 A.2d at 178; Blais,526 A.2d at 856); see also Pardey,518 A.2d at 1351 (citation omitted).
As to the first factor, the predictability of results, Defendants argue that Michigan law should apply because Defendants and Plaintiffs would reasonably expect that the state in which Mr. Carlson was exposed to asbestos would be the substantive law that *Page 18 
applies. In response, Plaintiffs opine that as national companies, Defendants would be subject to the law of any state.
In this case, Mr. Carlson was exposed to asbestos in Michigan; he was, however, diagnosed with and died from mesothelioma in Pennsylvania. It would be reasonable for Plaintiffs to have expected Pennsylvania law to apply as that was the state that Mr. Carlson was diagnosed with and treated for his disease and the state in which he was domiciled for seventeen years. Additionally, Defendants could not have expected Michigan law to apply to the exclusion of all other states where their products were available. See LaPlante, 27 F.3d at 742 (finding that "Honda, a large multi-national corporation, cannot argue convincingly that it expected Colorado law to apply to a case arising from a product manufactured in Japan and involving a Rhode Island citizen [who was injured when riding the ATV in Fort Carson, Colorado] simply because the product was originally sold in Colorado."). Additionally, Defendants could reasonably predict that some who were exposed to asbestos could move and feel the effect of that exposure in another state. Albeit not the circumstances in this case, asbestos exposure often occurs in more than one state; therefore, manufacturers should expect claims involving exposure to be brought under the law of the state where the plaintiff was treated for the related disease or was domiciled. Accordingly, this Court finds that the application of Pennsylvania law is the most predictable result.
Under the second factor, maintenance of interstate order, Defendants argue that Michigan law must apply to maintain interstate order because Michigan has a strong interest in regulating an injury that occurs within its state to a resident and taxpayer of the state. Plaintiffs, however, contend that Michigan law would not be offended if *Page 19 
Pennsylvania's law was applied in litigation between a Pennsylvania citizen and a Pennsylvania defendant. Pennsylvania law, according to Plaintiffs, would be offended if Michigan law was applied because those laws do not hold Defendants accountable for actions against a Pennsylvania citizen.
Relative to this factor, this Court will inquire as to whether one state's law and policy may be offended by the application of the other state's law. Brown, 105 R.I. at 327, 252 A.2d at 179. Michigan's lack of strict liability and joint and several liability, as well as its non-economic damages cap, represent Michigan's policies meant to encourage industry within its state.See, e.g., In re Disaster at Detroit MetropolitanAirport on Aug. 16, 1987, 750 F. Supp. 793, 801 (E.D. Mich. 1989) (stating that Michigan's negligence risk-utility products liability law "is designed to induce companies to conduct business in Michigan by protecting domiciled producers from excessive financial liability[; therefore] the state derives substantial revenues in sales and taxes, directly and indirectly, [furthering] the economic well being of the state"); Kenkel v. StanleyWorks, 665 N.W.2d 490, 500 (Mich. App. 2003) (upholding a statutory cap on non-economic damages because that rule "is rationally related to the legitimate governmental interest of encouraging the manufacture and distribution of products in Michigan and protecting those who place products into the stream of commerce from large damage awards in jury trials" (citingPhillips v. Mirac, Inc.,651 N.W.2d 437, 444-45 (Mich. App. 2002))). Although the actual exposure occurred in Michigan in the 1960s and 1970s, Pennsylvania's interest lies in compensating its resident who allegedly died as a result of that exposure in 2009. Thus, Michigan law would not be offended if Pennsylvania law was applied. Specifically, none of the companies are domiciled in Michigan and the *Page 20 
products involved existed in Michigan approximately forty years ago. The application of Michigan laws, therefore, would not serve their purpose of promoting industry in that state. See In reDisaster at Detroit Metropolitan Airport,750 F. Supp at 801 n. 16 (finding that Michigan did not have a significant interest in applying its laws because that application "would not induce . . . similarly situated companies[] to conduct business in Michigan or stimulate the economy).
In contrast, Pennsylvania's policies on those areas serve that state's citizens by protecting them from defective products.See, e.g., Musser, 562 A.2d at 281;Andaloro, 799 A.2d at 81. Thus, Pennsylvania will be offended if its law is not applied because its policy, to protect its residents, is of paramount significance given the diagnosis, illness, and death of Mr. Carlson.
Examining the other general factors in the most significant relationship analysis, this Court acknowledges that the judicial task would be simplified by applying Pennsylvania law, which is more similar to that of Rhode Island. The application of Michigan law, however, is not an insurmountable burden. Additionally, both forums have a governmental interest in the litigation. Pennsylvania's interest lies in protecting its residents from the consequences of exposure from toxic products and regulating the conduct of business operations within its borders. See Mitchell v. Lone StarAmmunition, Inc., 913 F.2d 242, 250 (5th Cir. 1990). Michigan has a significant interest in the litigation as a result of a state's strong interest in regulating the products within its borders and encouraging industry. See Kenkel, 665 N.W.2d at 500.But see In re Disaster at Detroit Metropolitan Airport,750 F. Supp at 801 n. 16 ("[T]he State of Michigan has a strong interest in applying its products liability law in order to prevent *Page 21 
similar disasters from occurring within its borders and to promote air safety. On a general level, all states, including Michigan, would endorse these safety concerns.")
Based on the instant facts, this Court has determined that Pennsylvania has the most significant interest in this litigation, particularly when it is the state where Mr. Carlson chose to live since 1992; where he was became ill with mesothelioma; where he was treated for mesothelioma; where he chose to die; and where his estate was probated. See, e.g. In re New YorkCity Asbestos Litig., N.Y. Slip Op. 21097, 2011 WL 921366, at *7 (N.Y. Sup. filed Mar. 11, 2011) (finding that Oregon law applied over that of New York because plaintiff moved to Oregon, where he became ill and died from mesothelioma, after his exposure to asbestos in New York). Thus, the scales tip in favor of Pennsylvania because of the manifestation of Mr. Carlson's injury within its borders, the predictability of results, and the maintenance of interstate order. Therefore, this Court finds that the state with the "most significant relationship" to this case is Pennsylvania.[12]
 III Conclusion
For the foregoing reasons, this Court finds that Pennsylvania law applies to the above-titled case. Counsel shall prepare an appropriate order for entry. *Page 1 
 AMENDED DECISION
This amended Decision is being filed to correct the following: On page 21, line 5 "Carlson chose to live since 1992; where he was become ill with mesothelioma;" should read as follows: Carlson chose to live since 1992; where he become ill with mesothelioma;. . . .
The remaining contents of the decision filed on April 7, 2011 remain the same.
[1] The moving Defendants for the Motion to Apply Foreign Law are CertainTeed Corporation and American Biltrite Inc.
[2] Federal Rule of Civil Procedure 44.1 provides in pertinent part that "[a] party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing." As this rule is substantially similar to Super Civ. P. R. 44.1, this Court will look to the Federal Rules and interpretations thereof for guidance. See Crowe Countryside Realty Assocs., Co., LLC v.Novare Engineers, Inc., 891 A.2d 838, 840 (R.I. 2006) (looking to federal court decisions for guidance as to how to interpret a Rhode Island Rule of Civil Procedure where the federal counterpart was "substantially similar").
[3] Both moving Defendants previously filed Rule 44.1 notice.
[4] This Court will not engage in a choice-of-law analysis when no issue is presented to the court. See NationalRefrigeration, Inc. v. Standen Contracting Co., Inc.,942 A.2d 968, 973-74 (R.I. 2008). Therefore, this Court did not address any conflicts of law in those motions. If the within decision materially affects those holdings, parties may seek reconsideration.
[5] Michigan does not provide for joint and several liability; thus, a plaintiff may recover from each defendant only the amount of fault attributable to such defendant. Mich. Comp. Laws. § 600.2956 (2000); seealso Romain v. Frankenmuth Mut. Ins. Co.,762 N.W.2d 911, 915 (Mich. 2009) (stating that the Michigan Legislature "abolished joint liability while retaining several liability" through Mich. Comp. Laws § 600.2956). In contrast, Pennsylvania recognizes joint and several liability, in which "joint tortfeasors generally are jointly-and-severally liable for the entire amount of a verdict, albeit that a jury may assign only a portion of fault to each." Maloney v. Valley Medical Facilities,Inc., 984 A.2d 478, 489 (Pa. 2009).
[6] Michigan does not recognize strict liability in products liability cases, while Pennsylvania recognizes strict liability as a doctrine available to plaintiffs when "`a defective condition unreasonably dangerous to the user or consumer causes harm to the plaintiff." Compare Gregory v. Cincinnati Inc.,538 N.W.2d 325, 339 n. 47 (Mich. 1995) (recognizing that while many jurisdictions recognize strict products liability, the Supreme Court of Michigan has not ruled on the issue); Prentis v. YaleMfg. Co., 365 N.W.2d 176, 182-84 (Mich 1984) (stating that "[a] fault system incorporates greater intrinsic fairness in that the careful safety-oriented manufacturer will not bear the burden of paying for losses caused by the negligent product seller" and, therefore, strict liability should not be applied in an absolute sense), with Schmidt v. Boardman Co., a Div. of TBC Fabrication,Inc., 11 A.3d 924, 941 (Pa. 2011) (explaining that Pennsylvania applies the strict liability doctrine as laid out in § 402A of the Second Restatement of Torts); Phillips v. A-Best Prods. Co.,665 A.2d 1167, 1170 (Pa. 1995) (quoting Restatement (Second)Torts § 402A) (citing Webb v. Zern,220 A.2d 853, 854 (Pa. 1966)).
[7] Michigan limits the non-economic damages recoverable by a plaintiff in a products liability action to "$280,000, unless the defect in the product caused either the person's death or permanent loss of a vital bodily function, in which case the total amount of damages for non-economic loss shall not exceed $500,000." Mich. Comp. Laws § 600.2946a. This limitation will not apply if the fact finder finds by a preponderance of the evidence that the death or loss resulted from gross negligence or if "the court determines that at the time of manufacture or distribution the defendant had actual knowledge that the defect would cause the injury that is the basis of the action, and the defendant willfully disregarded that knowledge in the manufacture or distribution of the product." Mich. Comp. Laws §§ 600.2946a, 600.2949a. Pennsylvania, however, does not apply a limit to non-economic damages. Donald J. Palmisano, "Health Care in Crisis: The Need for Medical Liability Reform," 5 Yale J. of HealthPolicy, L. Ethics 371, 379-80 (2005) (citing Pa. Const. art III, § 18).
[8] Lex Loci Delicti refers to the application of the "law of the place where the tort or other wrong was committed."Black's Law Dictionary (8th ed. 2004).
[9] As the California Supreme Court aptly explained in the context of when a cause of action for asbestos-related mesothelioma begins to accrue:
 "`Mesothelioma is a latent, progressively developing disease — decades can often pass between the time a person is first exposed to asbestos and the time he first develops a cancerous mesothelioma tumor. . . . It has been observed generally that diagnosis of toxic related disease is almost always an uncertain enterprise, particularly in the early stages of the disease. Lack of understanding of biological and physiological mechanisms, absence of serious dysfunction, and the slowly progressive nature of some diseases contribute to the difficulties of diagnosis. . . . The combination of lengthy latency periods and diagnostic difficulties is a unique feature of toxic substance cases for purposes of statutes of limitations analysis [or related legal issues]: No temporally discrete event exists that encompasses the defendant's breach and the plaintiff's injury. Instead, insidious disease litigation involves an extended chronology of causation unlike traditional snapshot torts.'" McCann v. Foster Wheeler LLC, 225 P.3d 516, 526 n. 4 (Cal. 2010) (quoting Buttram v. Owns-Corning Fiberglas Corp., 941 P.2d 71 (Cal. 1997)) (alteration in original).
[10] Although the location of the injury is significant to this determination, this Court's choice-of-law analysis is not complete; the location of the injury is merely a factor within the interest weighing analysis. See Busby,110 R.I. at 51-52, 290 A.2d at 211-12 (explaining the shift to the interest-weighing analysis).
[11] Stressing the importance of the place of manufacture in this case, however, may be unfair because that approach allows the manufacture state to enjoy the benefits associated with "liability laws which favor[] manufacturers in order to attract and retain manufacturing firms and encourage business within its borders while placing the costs of its legislative decision, in the form of less tort compensation, on the shoulders of nonresidents injured by its manufacturers' products." Phillips v. General Motors Corp.,995 P.2d 1002, 1012 (Mont. 2000).
[12] This Court acknowledges that under the doctrine of depecage, this Court could apply Michigan law to some issues and Pennsylvania law to others. Nevertheless, Pennsylvania's interest in protecting and compensating its residents permeates throughout this matter. This Court, therefore, declines to apply Michigan law to any issues because Pennsylvania's interest is the most significant to all conflicts, including, but not limited to, those involving joint and several liability, strict liability, and non-economic damages.
 *Page 1